## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

JOHN MASON, IV, *et al.*,

    Plaintiffs,

v.

MIKE HALE, *et al.*,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)

CASE NO. 2:11-CV-03155-TMP

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

COME NOW the Plaintiffs in the above entitled matter and submit their prehearing brief in support of class certification in accordance with this Court's Scheduling Order of June 20, 2012.

## BRIEF STATEMENT OF THE CASE

This case is brought by Drew Brennan Thacker who is currently, held in the Jefferson County Jail located in Birmingham, Alabama (hereinafter "Birmingham Jail"), awaiting trial. The Birmingham Jail was intended to house approximately six hundred inmates. (Pls.' Am. Compl. ¶8.), (Def.'s Resp. to Req. for Produc. of Doc Hale 00020) attached as Exhibit A.    The current occupancy of the Birmingham Jail is approximately twice that number.  (Ronald Eddings Dep. at 24, 68) attached as Exhibit B.

The conditions at the Birmingham jail are greatly exacerbated by the closing of the Jefferson County Jail located in Bessemer, Alabama (herein after "Bessemer Jail").  Since October of 2009, no inmates have been allowed to be housed at the Bessemer Jail.  Due to the

closure of the Bessemer Jail all persons who are to be held in the Jefferson County Jail system are housed at the Birmingham Jail. In the Birmingham Jail most cells were designed to be used by one person. *Id.* at 54. Because the Birmingham Jail was originally designed with single capacity cells, the day space each in pod was designed for twelve inmates. *Id.* at 20, (Def.'s Resp. to Req. for Produc. of Doc Hale 00326-369) attached as Exhibit C. Those day rooms have only twelve showers and one toilet. (Ronald Eddings Dep. at 25.) However, many cells are being inhabited by up to four persons. *Id.* at 54. This causes a predicament in which as many as thirty-eight inmates may share twelve showers and one toilet during the day. *Id.* at 25.

The Birmingham Jail population consists of inmates who have been convicted and are awaiting to be sentenced and transferred to a state prison, or inmate who are coming from a state prison to appear on new charges, or pretrial detainees who are either awaiting bond or have been denied bond for some reason but are yet to be convicted. *Id.* at 36-37, (Def.'s Resp. to Req. for Produc. of Doc Hale 00012-15) attached as Exhibit D.

The varied make up of this jail population creates a logistical puzzle that must be solved by the limited and strained jail personnel, which includes both sheriff's deputies and civilians. (Ronald Eddings Dep. at 13.) Some inmates or detainees are dangerously violent and must be segregated and closely monitored. *Id.* at 27, 38-39. Others require special attention due to varying factors like medical treatment, suicide watch, or other special needs that demand close motoring. *Id.* at 41. This further constricts the already limited space because some inmates may not be able to share cell space due to these restrictions. *Id.* at 27. The result is extremely crowded general population cells in which up to thirty-eight persons may share a cell block that was originally meant for twelve persons. *Id.* at 24.

Persons held at the Birmingham Jail are often denied the most basic human dignities. They are forced to sleep on the floor and only recently have been provided with mattresses to sleep on the floor. *Id.* at 55, (Def.'s Resp to Req. for Produc. of Doc Hale 00012-15) attached as Exhibit E. Visitations for those held at the Birmingham Jail are extremely limited; visitors most often will wait long periods of time and then be turned away without seeing their loved ones. (Ronald Eddings Dep. at 71.) The incoming mail is often unprocessed so that it does not reach its recipients, or does so late. *Id.* The Birmingham Jail is also failing in meeting the religious needs of persons held there. *Id.* at 108-109. Additionally, visitations and religious services have been outright suspended in the past. (Def.'s Resp. to Req. for Produc. of Doc Hale 00021-23) attached as Exhibit D. Staffing constraints extend the process time for money to be placed on inmates accounts, leaving prisoners and detainees without money on their accounts. (Ronald Eddings Dep. at 71.) Similarly, there is a lag in the time it takes a detainee to be released after acquiring a bond. *Id.*, (Def.'s Resp. to Req. for Produc. of Doc Hale 00021-23.) Persons who have not been convicted of a crime have to stay in these deplorable conditions for longer periods of time before they can be released, even though they have properly completed the bonding procedure on their part.

The current conditions at the Birmingham Jail mean that the inmates, detainees, civilian personnel, and deputies are put at risk. *Id.* at 81. There have been at least seven assaults on deputies in twelve months. *Id.* Injuries to inmates and detainees have risen drastically. *Id.* at 133. There are no more fire drills conducted at the Birmingham Jail. *Id.* at 98. There is a lag time in recognizing and identifying mentally ill persons in the Birmingham Jail. *Id.* at 72. Persons held at the Birmingham Jail are no longer able to get the mandated exercise time which leads to higher tensions on the part of those detained and a lower degree of control by the

deputies. *Id.* at 90-93. Overall the Birmingham Jail is not safe for either the persons being held there or the personnel watching over them. *Id.* at 66-67.

As a result of these conditions and the legal ramifications stated out in Plaintiffs' Complaint, Plaintiffs' filed this lawsuit seeking class certification to enjoin the treatment at the Birmingham Jail. In light of these facts and for the forthcoming reasons, this Court should grant class certification to the plaintiffs.

## CLASS CERTIFICATION STANDARD

"'For a district court to certify a class action, the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)'" *LaBauve v. Oin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir.2004). The court must conduct a "rigorous analysis" of the arguments put forth in support of class certification. *Anderson v. Garner,* 22 F.Supp.2d 1379, 1383 (N.D. Ga. 1997). "When assessing a motion for class certification, the Court does not inquire whether Plaintiffs have adduced sufficient evidence to prevail on the merits of their civil rights claims." *Id.* (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)). "[T]he Court inquires only whether evidence exists to support Plaintiff's claims, not whether the evidence can survive factual challenges levied by Defendants." *Id.* at 1383. "[T]he court must be careful not to allow the defendants 'to turn the class-certification proceeding into an unwieldy trial on the merits.'" *In re HealthSouth Corp. Securities Litigation*, 257 F.R.D. 260, 273 (N.D.Ala. 2009) (citing *In re Credit Suisse–AOL Sec. Litig.*, 253 F.R.D. 17, 21 (D.Mass.2008)). "[A] court should not determine the merits of a claim at the class certification stage, it is appropriate to 'consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will

be satisfied.'" *Heffner v. Blue Cross and Blue Shield of Alabama, Inc.*, 443 F.3d 1330 (11th Cir. 2006) (citing *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1188 n. 15 (11th Cir.2003)). "In reviewing a motion for class certification, the court generally is bound to take the substantive allegations of the complaint as true." *Bacon v. Stiefel Laboratories, Inc.*, 275 F.R.D. 681, 689 (S.D.Fla. 2011) (citing *Moreno–Espinosa v. J & J AG Prods., Inc.*, 247 F.R.D. 686 (S.D.Fla.2007)).

## ANALYSIS

### I. Named Plaintiff has Standing to Bring This Action for Injunctive Relief

"[A]ny analysis of class certification must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir.1987). The "constitutional threshold [of standing] must be met before any consideration of the typicality of claims or commonality of issues required for procedural reasons by Fed.R.Civ.P. 23." *Brown v. Sibley*, 650 F.2d 760, 771 (5th Cir. Unit A, July 1981). The doctrine of standing requires federal courts to be satisfied that the plaintiff alleged a personal stake in the outcome of the controversy so as to warrant his invocation of federal-court jurisdiction. *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009) (citing *Warth v. Seldin*, 422 U.S. 490, 498-499 (1975)). In order to meet Article III standing the plaintiff must establish either that the injury asserted was the consequence of the defendant's actions or that the prospective relief will remove the harm. *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 679 (S.D.Fla. 2004). "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Id.* (citing *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC),*

*Inc.*, 528 U.S. 167, 180–181 (2000)). "[J]ust as a plaintiff cannot pursue an individual claim unless he proves standing, a plaintiff cannot represent a class unless he has standing to raise the claims of the class he seeks to represent." *Wooden v. Bd. Of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1288 (11th Cir. 2001).

In the present case the plaintiff is continuously suffering an "injury in fact." Due to overcrowding in the Birmingham Jail, the plaintiff is deprived of his constitutionally protected rights and his safety is continuously put at risk. This injury is directly traceable to the challenged conduct on part of the defendants who refuse to provide adequate care for the plaintiff during his incarceration. A favorable judicial decision concerning the injunction of such behavior on the part of the defendants will prevent this type of injury from occurring in the future.

## II. Plaintiffs Satisfy the Requisites of Rule 23 (a)

Rule 23(a) of the Federal Rules of Civil Procedure delineates four prerequisites that are necessary for class certification. Plaintiffs are required to show:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These requisites are clearly established in this action for the forthcoming reasons.

### a. Numerosity.

The numerosity requirement is satisfied when it would be impractical to join all members of the purported class because they are too numerous and that class has a minimum standard of indefinability such that a legally definable class may ascertained through reasonable effort.

*Anderson* at 1384. "[I]mpracticability does not mean that joinder is impossible; Plaintiffs 'need only show that it would be extremely difficult or inconvenient to join all members of the class'" *Anderson* at 1384 (quoting *In re Domestic Air Transp. Anitrust Litig,*, 137 F.R.D. 677, 698 (N.D.Ga. 1991)). Plaintiffs must proffer up some evidence or a reasonable estimate of the members compromising the class which renders the joinder of all members impractical. The focus is not on numbers alone but rather on whether the joinder of all members "is practical in view of the numerosity of the class and other relevant factors." *Hill v. Butterworth*, 170 F.R.D. 506, 514 (N.D.Fla. 1997). Those other factors include 1) the geographical dispersion of the class, 2) the ease with which class members may be identified, 3) the nature of the action and 4) the size of each plaintiff's claim. *Lawson v. Wainwright*, 108 F.R.D. 450, 454 (S.D.Fla. 1986). Additionally, "[t]he class simply must meet a 'minimum standard of definitiveness which allow the trial court to determine membership in the proposed class'" *Anderson* at 1384.

In the present case the number of the class plaintiffs includes the approximately 1,200 persons held in the Jefferson County jail in Birmingham at any given time as well as any and all persons who will be held at the Birmingham jail in the future. The joinder of these plaintiffs is impossible because of the turnover rate at the Birmingham jail. Each plaintiff would have to be removed from the lawsuit once they left the jail and new plaintiffs would have to be added every time someone new entered the jail. The sheer number of the plaintiffs necessitates class certification for this action. However, a review of the additional factors stated in *Lawson* also dictates that class certification is proper under the numerosity requirement of Rule 23(a). Class members are easily identified because they include persons held in the Birmingham jail. The injunctive nature of the action lends itself to adjudication as a class action because a single injunction or declaratory judgment will remedy the ills of the entire class. Lastly, each plaintiff

7

has the same exact claim, which is the cessation of the depravation of their constitutional rights in the Birmingham jail. The plaintiffs in the proposed subject class are so numerous that joinder would be impractical and that the class members would be easily identifiable such that the numerosity requirement of Rule 23(b)(1) is met.

**b. Commonality**

The commonality requirement is satisfied when the plaintiffs show the presence of a question of law or fact that is common to the entire class. *Anderson* at 1385. Such a common question is one that arises from a nucleus of operative facts. *Id.* "[T]he commonality requirement is satisfied even though members of the of the proposed class present different factual or legal bases for their claims, so long as there are factual or legal issue that are common to the proposed class." *Id.* (citing *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986). "A broad based allegation of civil rights violations typically presents common questions of law and fact." *Pabon v. McIntosh*, 546 F.Supp. 1328 (E.D.Pa. 1982). "It is not necessary that all questions of law and fact raised in the litigation be common. Rather there need only be a single issue common to the members of the class." *Bradley v. Harrleson*, 151 F.R.D 422 (N.D.Ala. 1993).

Here the questions of law and fact are common, if not identical, to the entire class. Namely, the question of whether the current conditions at the Birmingham jail, which are systematically implemented, create an environment in which persons being held at the Birmingham jail are deprived of their constitutionally protected rights. These common questions of law are predicated on a nucleus of operative facts, namely that budget cuts in the Sherriff's Department budget have created living conditions in the Birmingham Jail that violate the plaintiffs' rights under the United States Constitution and the Religious Land Use and

Institutionalized Persons Act. In fact there is a litany of cases that have affirmed the finding of the commonality requirement in the face of similar legal issues and facts. See *Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008) (finding commonality among injured inmates who were denied access to crutches); *Hagan v. Rogers*, 570 F.3d 146 (3rd Cir. 2009) (finding that assertion by class that members were being subjected to serious communicable diseases due to the deliberate indifference of personnel at prison treatment center satisfied the commonality requirement); *J.D. v. Nagin*, 255 F.R.D. 406 (E.D.La. 2009) (finding commonality among a class of detained children because the issues raised by the class questioned the legality of the policies and procedure used in their detainment); *Bilhovde v. St. Croix County, Wis.*, 219 F.R.D. 607 (W.D.Wis. 2003) (finding commonality among class members who were stripped searched in prison without reasonable suspicion, in accordance with unconstitutional policy); *Garrison v. Asotin County*, 251 F.R.D. 566 (E.D.Wash. 2008) (finding that commonality requirement was met even though both pre-trial detainees and other inmates of a jail were included in the class because all class members were subjected to the same systematic treatment of having to pay a booking fee without due process).

### c. **Typicality**

To meet the typicality requirement, plaintiffs must show that the claims and defenses of the representatives are typical of the claims and defenses of the class as a whole. *In re HealthSouth Corp. Securities Litigation*, 213 F.R.D. 447 (N.D.Ala. 2003). "The requirement of typicality precludes certification of a class 'where the legal theories of the named plaintiffs potentially conflict with those of the absentees.'" *Id.* (quoting *Georgine v. Amchem Prod. Inc.*, 83 F.3d 610, 631 (3rd Cir.1996)). "To be typical, '[a] class representative must possess the same interest and suffer the same injury as the class members.'" *In re Scientific-Atlanta, Inc. Securities Litigation*, 571 F.Supp.2d 1315, 1325 (N.D.Ga. 2007) (quoting *Cooper v. Southern Co.*, 390

F.3d 695, 713 (11th Cir. 2004)). "A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984).

Mr. Thacker has undergone the same type of treatment that this action seeks to enjoin, specifically, the inhumane jail conditions that have violated his rights under the United States Constitution and the RLUIPA. He possesses the same interest as the class members in stopping the civil rights violations occurring at the Birmingham jail. There is absolutely no conflict between the claims of the named plaintiff and the class members. There are very few, if any, factual difference between the claims of the named plaintiff and those of the class members and certainly none that would rise to the level necessary to defeat the class certification on the basis of the typicality requirement.

**d. Adequacy**

The purpose of the adequacy requirement is to uncover conflicts of interest between named parties and the class they seek to represent. *London v. Wal-Mart Stores, Inc.*, 340 F.3d 506 (11th Cir. 2003).

> Because all members of the class are bound by the res judicata effect of the judgment, a principal factor in determining the appropriateness of class certification is the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class.

*Lyons v. Georgia-Pacific Corp. Salaried Employees Retirement Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000. "In order to satisfy the 'adequacy of representation' requirement, the court must determine: (1) that the plaintiff's attorney is qualified, experienced, and will competently and vigorously prosecute the suit, and; (2) that the interest of the class representative is not antagonistic to or in conflict with other members of the class." *Wright v. Circuit City Stores,*

*Inc.*, 201 F.D.R. 526, 545 (N.D.Ala. 2001) (citing *Griffin v. Carlin,* 755 F.2d 1516, 1533 (11th

Cir.1985)). "As to the attorney-competence prong, the 'adequate representation requirement

involves questions of whether plaintiffs' counsel are qualified, experienced and generally able to

conduct the proposed litigation.'" *Id.* (quoting *Griffin*, 755 F.2d at 1533). In order to defeat class

certification via the conflict prong there must be a fundamental conflict that is specific to the

issues in controversy. *Scientific Atlanta*, 571 F.Supp.2d at 1331. "The existence of minor

conflicts alone are not sufficient to defeat a party's claim to class certification." *Id.*

In the present case, Plaintiff's counsel is more than qualified and experienced to

competently and vigorously prosecute this lawsuit. Plaintiff's counse has handled multiple mass

torts litigation and civil rights litigation in state and federal court. Similarly, Plaintiff's counse is

financially capable of handling this litigation and has the personnel and resources to litigate these

claims. There is also no conflict between the interest of the class representative and the class

members. As stated previously, class members and the named plaintiffs all seek the same thing,

which is the reparation of the conditions in the Birmingham jail so that the grievous

constitutional violations will be remedied.

## III.   Plaintiffs Satisfy the Requisites of Rule 23 (b)

"Once the plaintiffs have established the four prerequisites of Rule 23(a), they must also

satisfy at least one of the alternative requirements of Rule 23(b)." *Id.* Rule 23(b) states:

A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would
create a risk of:

(A) inconsistent or varying adjudications with respect to individual class
members that would establish incompatible standards of conduct for the party
opposing the class; or
(B) adjudications with respect to individual class members that, as a practical
matter, would be dispositive of the interests of the other members not parties to

the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

   (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

   (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

   (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

   (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b).  The plaintiff seeks injunctive relief to stop the current and continuous violations of his constitutionally protect rights.  For the forthcoming reasons he satisfies the requisites of Rule 23(b)(2).

"The language of Rule 23(b)(2) can be distilled to two basic requirements: (1) the opposing party's conduct or refusal to act must be 'generally applicable' to the class; and (2) final injunctive or corresponding declaratory relief must be requested for the class. *Anderson*, 22 F.Supp.2d at 1386 (citing Garner, 22 Wright, Miller, & Kane, supra, § 1775, at 447–48). "The term 'generally applicable' does not require 'that the party opposing the class ... act directly against each member of the class. The key is whether his actions would affect all persons similarly situated so that his acts apply generally to the whole class.' Thus, '[a]ll the class members need not be aggrieved by or desire to challenge the defendant's conduct in order for one or more of them to seek relief under Rule 23(b)(2).'" *Id.* (citing *Johnson v. American Credit Co.*

*of Georgia*, 581 F.2d 526, 532 (5th Cir.1978) (internal citations omitted). The second prong of the Rule 23(b)(2) analysis is satisfied "when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2557 (2011). When the resolution of each class member's claim will hinge on the defendant's standardized conduct, a single injunction or declaratory judgment would provide relief for each member of the class. *Olson v. Brown*, 2012 WL 3044264 at \*16 (N.D.Ind. 2012). Standardized conduct is such "conduct which can be enjoined or declared unlawful only as to all class members or as to none of them." *Id.*

Here the conduct of the opposing party is clearly generally applicable to the class. The persons held in the Birmingham Jail are suffering violations of their constitutionally protected civil rights. By enabling the current Jail conditions, Defendants have created an environment of continuous systematic violations of the rights of all persons represented in the class action as well as those of the named plaintiff. A single injunction would remedy all members of the class because the conduct of the defendants is standardized and uniform. In other words, there is no way that the injunction could provide relief for only certain members of the class as opposed to the whole class. Because of this injunctive relief is the proper avenue to provide remedy for both the named and class plaintiffs, all of the requirements of Rule 23 (b)(2) have been met.

WHEREFORE, the plaintiff, through his counsel of records respectfully requests this Court certify a class consisting of all persons currently held, or to be held in the future, at the Jefferson County Jail, in Birmingham, Alabama, for the purpose of adjudicating this civil rights action.

Respectfully Submitted,


/s/ Dan C. King, III
Donald W. Stewart
Dan C. King, III
Attorneys for Plaintiffs

OF COUNSEL:

STEWART & STEWART, P.C.
1826 3rd Avenue North, Suite 300
Bessemer, Alabama 35020
Phone:   (205) 425-1166
Fax:      (205) 425-5959


## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2012, I mailed a copy of the above and foregoing document by U.S. Mail to the following counsel:

French A. McMillan
Jefferson County Attorney's Office
716 Richard Arrington Boulevard North
Room 280
Birmingham, Alabama 35203

James E. Murrill, Jr.
Riley & Jackson, P.C.
1744 Oxmoor Road
Birmingham, Alabama 35209


/s/ Dan C. King, III
OF COUNSEL

Exhibit A

Times Daily - Google News Archive Search - Windows Internet Explorer

google.com

File  Edit  View  Favorites  Tools  Help

Google  "jail overcrowding" birmingham          Search    jail overcrowding  More

Favorites      10th Judicial Circuit, Jeffers...

Times Daily - Google News Archive Search

Google news

| Search Archive | Search the Web | Archive S

Times Daily - Jul 26, 1998   Browse this newspaper »     Browse all newspapers »

## Jefferson jail overcrowding causes concern

*The Associated Press*

BIRMINGHAM — Justice Department consultants who recently visited Jefferson County's two jails said they are a "greenhouse" for violence because of their overcrowded conditions.

In their report, the consultants said the jails are understaffed and inmate medical care is inadequate.

Previous court action led to the construction of the existing jails, in Birmingham and Bessemer. The Birmingham jail was built to house 620 inmates, but currently has 1,035 beds. The Bessemer lockup was designed to house 128 prisoners, but has 202 beds.

"We're under the gun to build a new jail to relieve overcrowding in the old jail," said Assistant County Attorney Charles Wagner. He said a proposed agreement with plaintiffs in the suit requires the county to "build something fast so we can handle the overflow and have room to expand."

Shop The TimesDaily Ads, You'll Find Ba

## DEBT CONSOLIDAT

○ Back House Payments ○ Back Taxe
○ Past Due Auto Loans ○ Credit
ALL CAN BE INCLUDED!

### EVERYONE QUALIFIES B\ NO CREDIT NEEDEC

24-Hour Recorded Informatic
(256) 740-0300

Florence - 760-1010 ○ Moulton - 97
Offices are in Florence, Alabama



BOND, BOTES, S\
& LARSEN, P.

ATTORNEYS PROVIDING FINANCI

No representation is made that the quality of legal ser
greater than the quality of legal services performed by
U S Code including Chapter 13 and Chapter 7 Bank

2

Exhibit B

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4                    CASE NUMBER

5                 2:11-CV-03155-TMP

6

7    JOHN MASON, IV,

8    ISHMAEL KHALID GREGORY,

9    DARRELL LEE MADDOX,

10   and others similarly situated,

11                    PLAINTIFFS,

12   VS.

13   MIKE HALE, in his official

14   capacity as Sheriff of Jefferson County,

15   Alabama, Jefferson County, Alabama,

16   the Jefferson County Commission,

17   David Carrington, George Bowman,

18   Sandra Little Brown, Jimmie Stephens,

19   and Joe Knight, in their official capacities.

20              DEFENDANTS.

21              DEPOSITION OF:

22        CHARLES RONALD EDDINGS

23         TUESDAY, MAY 29, 2012

1    enough?

2    A.    It was not, sir.

3    Q.    Can you tell me, when you talk about a

4    separate amount, the $4,000,000 up until 2010

5    when it went up to $4,140,000 for inmate health

6    care, tell me about that.  Was that the health

7    care that was in-house, or was that a health care

8    that was contracted out, or what?

9    A.    This is all contract health services.

10   Q.    Can you tell me, first of all, about who is

11   the person or department or group or company that

12   you contract with for the health care?

13   A.    Currently, it is Advanced Health Care.

14   Q.    When they would cut your budget each year

15   where you could not maintain the status quo, what

16   would that do to your department, the jail

17   department?

18   A.    It put the deputies at a higher risk,

19   because we have inadequate numbers of deputies.

20   The cell blocks that were designed for twelve men

21   now have, depending on the block -- the block

22   fluctuates by classification.  Depending on the

23   block, it is now 36 to 38 inmates at my highest

1    inmates.

2    Q.    Now, currently today, how many folks are in

3    the jail today?

4    A.    Today's count was 1,237.

5    Q.    1,237 in a jail that's supposed to hold --

6    A.    744 in general population, 1,033 overall.

7    Q.    So that's an additional 204 inmates, if

8    I've done my math correctly.

9    A.    Yes, sir.  But, again, if every bed is

10   full.  Again, we have empty beds.  We cannot put

11   someone in the TB cell.  We can't put someone on

12   suicide watch when they're not.  I can't fill a

13   cell -- a critical cell that I may need in ten

14   minutes.  We're at the mercy of what the officers

15   bring.  If he is an athlete who competes, perfect

16   health, good family, good background, just messed

17   up, he's going to be a great prisoner, and he'll

18   work out fine in there and not cost us a dime

19   except what he eats.  But a lot of the people

20   that we get have not had good health care; they

21   come from violent surroundings, violent

22   backgrounds, and that's all they know, so they

23   fight for what they get.  And because of this

1    waits in holding there and meets with a

2    classification officer on third floor, and they

3    find him a new place to live.  Many times with a

4    fresh cast with the swelling of tissue

5    underneath, he's going to be housed 48 hours on

6    the medical floor where he can be seen at will by

7    the nurses.

8    Q.    I know you've said something about this

9    earlier; but if you would, tell me about the

10   makeup of a cell today.

11   A.    Depending on the classification is

12   dependent on how many people are in the cell

13   block, and it is different on every cell block on

14   every floor.  The most that I have in what was at

15   one time a one-man cell is four people on the

16   floor.

17   Q.    You say four --

18   A.    Wait.  Four people in the cell, two on the

19   floor.  Excuse me.

20   Q.    And you've got two beds, I remember you

21   telling me?

22   A.    Yes, sir.

23   Q.    And on those beds, are there mattresses on

1    Q.    Were you part of that at that time?

2    A.    No, sir.

3    Q.    So the single-man cell went to a double-man

4    cell?

5    A.    Yes, sir.  But due to the structure of the

6    facility and the hard design of the building, you

7    could not add the additional showers to the

8    dayroom or to the cell.  So now you had 24 men

9    with one toilet and one shower in a dayroom all

10   day.

11   Q.    One toilet for 24 men, and then twelve

12   showers which were supposed to be for the twelve

13   men?

14   A.    One shower for 24 men.

15   Q.    One shower for 24 men?

16   A.    Yes, sir.

17   Q.    You said that's what your budget was in '05

18   and '06.  What happened to the budgets in '07 and

19   '08?

20   A.    In '07 the budget was cut by the county

21   commission to $60,516,179.  In '08 -- I

22   apologize.  Let's go back to '07.  Plus

23   $4,000,000 for the health care services.

1   point, sharing one toilet, one shower during the

2   day.

3   Q.    Now, that's per cell block?

4   A.    That's per cell block, up to four per cell,

5   two sleeping on the floor.

6   Q.    Now, let's talk about the loss of deputies.

7   Was there a loss of deputies in '09?

8   A.    Yes, sir.

9   Q.    And approximately how many deputies, if you

10  recall, that y'all lost in '09 from your

11  department in the jail?

12  A.    All new personnel come to the jail.  So

13  those that were RIF'd and allowed to go other

14  places, they came from the jail; and overall,

15  Bessemer and Birmingham, I believe it was 53.

16        MR. MURRILL:  You may want to tell him what

17  a RIF is.

18  A.    Reduction in force.

19  Q.    So you had a reduction in force of some 53

20  deputies?

21  A.    I believe so, yes, sir.

22  Q.    And that would be overall?

23  A.    That was in Birmingham and Bessemer jails.

```
 1   A.      They then go to housing where they're

 2   housed with -- depending on their classification,

 3   either from one extreme, to a suicide watch, to

 4   general housing with others.

 5   Q.      Now, do y'all have it broken down there at

 6   the jail whether the prisoner has felony counts

 7   against him, whether they have county charges

 8   against him, those type things?

 9   A.      We have it broken down as our record, yes,

10   sir.

11   Q.      Do you know which inmates are pretrial

12   detainees versus convicted county prisoners or

13   state inmates?

14   A.      Yes, sir.

15   Q.      Can you tell me, as we sit here today, how

16   many folks that y'all have in the jail that are

17   pretrial detainees?

18   A.      I do not have the breakdown.

19   Q.      How many state prisoners do y'all have?

20   A.      We have in excess of 200 state inmates.

21   Q.      I want to make sure me and you are talking

22   about the same thing.  When we're talking about

23   state inmates, this is someone who has been
```

```
1    convicted and is waiting to go to the

2    penitentiary?

3    A.     Yes, sir.

4    Q.     Now, do you also have state inmates that

5    are here in the Birmingham jail that are brought

6    back up because of other charges?

7    A.     Yes, sir.  And that is part of that

8    200-plus count.

9    Q.     And do you also have those persons who are

10   charged with misdemeanor charges only?

11   A.     We house felonies.  They may have

12   misdemeanor companion cases.  The county workers,

13   the county time workers, we have an average of

14   eight or ten of those out of this entire

15   population.

16   Q.     Do you have any charges that's been brought

17   by the county, misdemeanor charges, for which the

18   persons are not able to make bond?

19   A.     Not to my knowledge.

20   Q.     Where are the folks who have misdemeanor

21   charges only, where are they held before they

22   make bond or before they go to court?

23   A.     They go through the same process as
```

1   A.      2009, it was 152.

2   Q.      And was there a greater number before 2009?

3   A.      2009, we had an allocation for 154

4   deputies.  We never made it to 154.  It was

5   always someone retiring, and you having to

6   replace those people.  There were 152 in

7   Birmingham and 46 in Bessemer, but they were

8   under the Bessemer command structure.

9   Q.      How many different departments are there in

10  the sheriff's department, like patrol and those

11  type things?

12  A.      You have patrol, Birmingham and Bessemer;

13  you have corrections, Birmingham and Bessemer;

14  vice and narcotics, both.  That's six.  You have

15  court services and civil in both; you have

16  warrant detail in both; operations in Birmingham

17  for county-wide; victims assistance out of

18  Birmingham for county-wide; sex offender unit --

19  did I name them?

20  Q.      No, sir.

21  A.      You have them out of Birmingham

22  county-wide.

23  Q.      Currently how many people are on patrol, if

1   jail?

2   A.    774 general population, 1,033 overall.

3   Q.    1,033 overall?

4   A.    Yes, sir.

5   Q.    What is the -- when I'm looking at the

6   difference, I'm looking at 226, 259 additional

7   people?

8   A.    Yes, sir.  But actually that is only

9   accurate by raw numbers.  I have empty beds in my

10  facility because I cannot fill every bed.  The

11  beds are -- or the inmates are assigned by

12  classification.  I could not put someone with a

13  DUI charge with someone for capital murder.  I

14  could not put a 100-pound, five-foot-two

15  individual in a cell with a six-foot-four,

16  300 pounds.  I cannot put someone off the street,

17  who's never been in jail before, who is

18  terrified, in with repeat offenders.  These

19  people are assigned where they will best be kept

20  in a safe, and I guess you would say mentally

21  stable area of the jail.  It's stressful enough

22  to come to jail.  Your most dangerous person to

23  commit suicide is middle class, never been in

1    everyone else.

2    Q.    In other words, if you've got somebody that

3    has misdemeanor charges and no felony charges

4    that's 200 pounds or 225 pounds --

5    A.    He's going to go to level 4, which is where

6    our workers in the lowest risk are housed.

7    Q.    I guess I interrupted you when you were

8    talking about housing.

9    A.    No, that's fine.

10   Q.    Tell me about housing again, if you would,

11   please, sir.

12   A.    The highest risk is a level 9.  Level 9

13   inmates all have a history of violence or have a

14   violent crime of which they're charged.  They

15   also have on that floor Max 1.  That's our

16   maximum security.  It's twelve cells, they're

17   locked in the cell 23 hours a day.  They cannot

18   be moved out of that cell block without two

19   deputies.  They cannot leave the cell block

20   without manacles -- shackles and handcuffs, and a

21   belly chain, waist chain.  These people are the

22   worst of the worst, nothing to lose, repeat

23   offenders, multiple murders, looking at death row

1    for the majority of the time.  From time to time,

2    we'll have someone that's in there on a robbery

3    charge that is just mean and that can't live

4    around others.

5    Q.    What's your next level?

6    A.    Level 8 is also a violent floor, but it's

7    charges of violence.  These people pretty much

8    know how to behave once inside of the jail, but

9    their charges and what they have done on the

10   street prohibit them being in general housing

11   with others.  These are going to be robbers,

12   rapes, heavy assaults, attempted murders, murder.

13   The next level is level 7, and that is my general

14   housing with risk.  These are general population

15   nonviolent crimes, but people that you cannot let

16   have any access to a means of escape or ones that

17   cannot operate within the facility without strong

18   supervision.

19   Q.    All right, sir.  Level 6?

20   A.    Level 6 is general housing, juveniles.

21   They get along well.  These are nonviolent

22   crimes.  The inmate's bond is usually the only

23   thing that is keeping him in the facility;

1    A.    The Birmingham police officer that was

2    arrested Friday is on level 4.

3    Q.    In other words, someone that you have to --

4    A.    We have to watch over.

5    Q.    -- watch more closely?

6    A.    Yes, sir, because of the suicide risk.

7    Plus, if an officer's child or an officer goes

8    in, they become a target.  If a political figure

9    goes through, he's on level 4, or she.  She would

10   go to 5 in the same facility.  They have a

11   protective custody for special needs on 5 as

12   well.

13   Q.    And do you have a level 3?

14   A.    That is medical.  Level 3 is a powder keg,

15   as we call it, because you have all

16   classifications coming together for sick call and

17   medical needs.  While we bring down one floor at

18   a time, two inmates fighting causing injury to

19   one another come to level 3 for treatment,

20   because if both are bleeding, you have to treat

21   both at the same time.  A sick call is running,

22   and you have people from one floor waiting to see

23   the nurse and the doctors.  You can have someone

1    enough?

2    A.    It was not, sir.

3    Q.    Can you tell me, when you talk about a

4    separate amount, the $4,000,000 up until 2010

5    when it went up to $4,140,000 for inmate health

6    care, tell me about that.  Was that the health

7    care that was in-house, or was that a health care

8    that was contracted out, or what?

9    A.    This is all contract health services.

10   Q.    Can you tell me, first of all, about who is

11   the person or department or group or company that

12   you contract with for the health care?

13   A.    Currently, it is Advanced Health Care.

14   Q.    When they would cut your budget each year

15   where you could not maintain the status quo, what

16   would that do to your department, the jail

17   department?

18   A.    It put the deputies at a higher risk,

19   because we have inadequate numbers of deputies.

20   The cell blocks that were designed for twelve men

21   now have, depending on the block -- the block

22   fluctuates by classification.  Depending on the

23   block, it is now 36 to 38 inmates at my highest

```
 1    all those beds?

 2    A.      There are now.

 3    Q.      And how about the ones, the two that sleep

 4    in the floor?

 5    A.      They're on a mattress.

 6    Q.      And there's mattresses on the floor for

 7    both of those?

 8    A.      There are now.

 9    Q.      You say, "There are now."  When did that

10    change?

11    A.      We were able to order mattresses.  The

12    sheriff had some grant money or found funding,

13    and we ordered replacement mattresses roughly two

14    months ago.  Up until then, we had over 100

15    sleeping on blankets on the floor.

16    Q.      Now, is there some regulations now that

17    tell you how much room an inmate is to have in a

18    cell now?

19    A.      Yes, sir.

20    Q.      And how much is that?

21    A.      70 square feet.

22    Q.      And how much room does an inmate have in

23    one of these cells where you have four?
```

 1    on his books that he can spend at the jail store,

 2    and also has caused a lag in how quickly he gets

 3    mail from outside, how quickly we can get people

 4    in and get them processed to go upstairs and

 5    visit their loved one.  Morale in the jail is

 6    extremely important to us.  They're not there to

 7    be coddled, but they're there to be treated by

 8    like a human.  And if I know that my mother has

 9    been standing down in that line to come see me

10    for two hours, and then was turned away because

11    there's so many people in line to see others, I'm

12    going to be upset.  And we have people turned

13    away every day.

14    Q.    The fact that you have a lack of staffing

15    also, does it also increase the amount of time

16    that it takes for someone to be bonded out?

17    A.    Well, that's my second most common

18    complaint, is it took eight hours, nine hours,

19    ten hours for me to get my child out of the jail.

20    Q.    When before when you had proper staffing,

21    it would be common to take on --

22    A.    Three to four.  Three to four hours would

23    be a very busy day.

1    paying the county commission $35 a day for each

2    one of them.

3    Q.    You can't afford to have those other

4    inmates because you don't have the room for them;

5    is that correct?

6    A.    No, sir.

7    Q.    Now, has there been any difficulty there at

8    the jail in Birmingham with regards to religious

9    practices?

10   A.    Yes, sir.

11   Q.    What religious practices do y'all allow at

12   the Birmingham jail?

13   A.    We have a nondenominational ministry that

14   comes in.  If we have someone outside of the

15   Christian faith that wants a representative of

16   their faith to come to the jail, they make sure

17   that that happens, and it is followed up on by

18   our chaplain to make sure.

19   Q.    When did that start?

20   A.    That has always been the case, but not

21   always followed.

22   Q.    Did it just start being followed again?

23   A.    We had a situation where a person -- a

1    volunteer, not a county employee -- caused great

2    drama within my jail by telling a person of the

3    Muslim faith that Allah was Satan.  And it was

4    like so much dynamite in a confined area.

5    Lawsuits came from that, and this man is no

6    longer allowed in my jail under any

7    circumstances.

8    Q.    Do you have a lot of Muslims in your jail

9    now?

10   A.    Not right now, no, sir.

11   Q.    Do you have some?

12   A.    We do.

13   Q.    Do you have some Jews?

14   A.    Don't know.

15   Q.    Has this not been made known to you?

16   A.    It has not.

17   Q.    Do you have any Buddhists?

18   A.    Don't know.

19   Q.    That has not been made known to you?

20   A.    No, sir.

21   Q.    Is that something that you would know?

22   A.    Not necessarily.  As I walk through the

23   jails, sometimes I will be approached by inmates

1    Q.    What does the effect of lack of staff have

2    on the staff safety?

3    A.    We have had seven -- within the past twelve

4    months, we have had seven deputies that have been

5    attacked, assaulted, that have required some sort

6    of medical follow-up.  We've had two broken arms.

7    We have had -- I know there was a twisted ankle.

8    We've had cuts to cheekbones from being hit with

9    fists.  We had one deputy whose eye was beaten

10   out of the socket and had broken ribs by one man.

11        MR. McMILLAN:  I'm sorry.  What was the

12   time period you said?

13        THE WITNESS:  Past twelve months.

14        MR. McMILLAN:  Okay.

15   A.    The inmates have 24 hours a day to watch

16   us.  They know when we're short-staffed; and, of

17   course, they have access to the news to hear

18   about budget cuts.  We do the best we can with

19   what we have.

20   Q.    This change in the incidence of

21   inmate-on-staff violence, has this increased --

22   A.    Yes, sir.

23   Q.    -- each year because of the cut in the

1    number increased over the last couple of years or

2    decreased?

3    A.    The injuries from fights have increased.

4    Other than that, the other injuries, the

5    remaining injuries have remained approximately

6    the same.

7    Q.    Can you give me some examples of some of

8    the injuries that you know to have occurred from

9    these fights?

10   A.    Broken eye orbits, broken jaw, loosened and

11   knocked-out teeth, cuts to the orbital bone under

12   the eye, broken hands from fighting, one broken

13   arm.  Those are the ones of which I'm aware.

14   Q.    Have you, at any time, ever testified

15   before or been called to any type of hearing

16   before the county commission in regards to your

17   budget?

18   A.    Yes, sir.

19   Q.    When was that?

20   A.    2009, Judge Boohaker's court.

21   Q.    And when you went in there and gave

22   testimony, can you summarize for me in maybe one

23   sentence what your testimony was in regards to

1    Q.    In the jail there, do y'all have a fire

2    protection plan or an evacuation plan in case of

3    fire?

4    A.    Yes, sir, we do.

5    Q.    Who keeps that evacuation plan?

6    A.    Central control and our training officers.

7    Q.    Do y'all have active fire drills?

8    A.    Not anymore.

9    Q.    When did that stop?

10   A.    2009.

11   Q.    And is that when the budget started being

12   cut?

13   A.    Yes, sir, and we lost personnel.

14   Q.    And is that the reason why you do not have

15   those drills?

16   A.    Yes, sir.

17   Q.    Now, what would happen today if there was a

18   fire on floors 8 and 9?

19   A.    What is our procedure?

20   Q.    Yes, sir.

21   A.    We would open the fire stairwells on 8 and

22   9, and they would empty down to the first floor.

23   Deputies would have to instruct over the loud

1    Q.    Would it be fair to say that the lack of

2    personnel makes intake of mentally ill persons

3    cursory?

4    A.    Yes, sir.

5    Q.    And why is that?

6    A.    You have a volume of inmates that you have

7    to work; otherwise, they back up and the next

8    shift has to deal with them.  These inmates are

9    in a holding area not designed for any sort of

10   long-term housing.  You have to feed them, take

11   care of them, and properly manage them.  You

12   don't have the personnel downstairs to do that.

13   The volume doesn't stop with 19,000 people a year

14   coming in.  The volume doesn't stop, so you have

15   to deal with them, yes.  There's people who will

16   get by and they will wind up upstairs, and then

17   we find out at a later date that they have mental

18   problems.

19   Q.    Would it be fair to say also that the lack

20   of funding and lack of personnel because of the

21   lack of funding also make the intake of those

22   persons who are physically ill cursory?

23   A.    We do everything we can to avoid it.  We

1   A.   No, sir, because I haven't let it happen.

2   Each cell block is cleaned three times a day,

3   after each meal; and they're cleaned by, using

4   our terminology, 10 cell workers. There are

5   workers who live in cell number 10 of each cell

6   block, and it's their job to clean it. Now,

7   we've had to improvise, meaning that when the

8   cleaners that we were using became too expensive,

9   we went to an all-purpose cleaner to do the same

10   job that was not designed to do that job. An

11   all-purpose cleaner that may be designed for the

12   cleaning of walls and countertops we're using on

13   showers, floors, wherever need to be. We use

14   bleach as a disinfectant. It's cheap. And that

15   is how we're keeping mold in the showers, in the

16   toilet areas, the tabletops, clean and

17   disease-free. After every meal, the tabletops in

18   the dayroom are sprayed down -- after they're

19   cleaned, they're sprayed down with water and

20   Windex -- I mean water and Clorox, and allowed to

21   evaporate dry.

22       (Whereupon, at this time a lunch break was

23   taken.)

1    Q.    Now, we talked about a lot of things this

2    morning.  One thing we haven't talked about is, I

3    wanted to ask you, are there provisions made for

4    the prisoners where they can get exercise?

5    A.    No, sir.

6    Q.    Have there been provisions before?

7    A.    Yes, sir.

8    Q.    When did that stop?

9    A.    When our manpower was cut in 2009.

10   Inmates, by federal court decisions, are due one

11   hour of exercise per day, and we do not have the

12   manpower to supervise inmates while they're on

13   exercise area, so it's been dispensed with.

14   Q.    And that exercise area was within the jail?

15   A.    Yes, sir.

16   Q.    And I believe there was, like, a basketball

17   court?

18   A.    It's a quarter-court, one-quarter-size

19   basketball court.  It is just to the left of the

20   main slider as you're coming in past visitation

21   on each floor.  Medical floor does not have one.

22   Q.    What does the effect of an inmate being

23   able to exercise have on that inmate?

1   A.     He does not atrophy away.  He stays in as

2   good a condition as he came in, or better, which

3   is my responsibility to keep him in good or

4   better.  Also, the confinement starts to play on

5   your mental health.  This gives you access to

6   fresh air.  This gives you access to burn off

7   energy; otherwise, it's just pent-up.  It can be

8   used as a control tool where if the -- the

9   inmates are disciplined much like children.  "If

10  you do that again, there will be no television

11  tonight."  Well, that was one thing that we were

12  able to use as a tool, "There will be no

13  basketball if you do this again."  And now that

14  is a tool of control that has been taken from us.

15  Q.     Would it have an effect on the morale of

16  that inmate --

17  A.     Yes, sir.

18  Q.     -- to have exercise?  And has the fact that

19  there is no exercise, no formal exercise anymore,

20  is that something that ties in to the safety of

21  personnel there --

22  A.     Yes, sir.

23  Q.     -- not only inmates, but also the staff?

```
 1   A.     Yes, sir.  It's a safety issue that we

 2   cannot do it now and adequately protect the staff

 3   and the inmates, and it is a safety issue in that

 4   it is a lowering of morale and pent-up energy.

 5   Q.    And you had mentioned something about

 6   you're not able to keep them in as good condition

 7   leaving as they were when they came in.  Would

 8   that be something that would go to their health,

 9   the health of that inmate?

10   A.     Yes, sir.

11   Q.    You talked this morning about the U.S.

12   marshals coming in and giving you a report about

13   every six months, and that that report went to

14   the sheriff.  Do they cite the jail for any

15   deficiencies in the report?

16   A.     They will not -- the marshals are in a very

17   unique situation in that they really cannot

18   afford to damn us on paper, because we are the

19   holding center for their inmates for federal

20   court in Birmingham.  But off paper I was told,

21   "We're getting everybody out of here and moving

22   them to Shelby County except for those that have

23   active cases and need medical care."  I asked
```

1    allowing people out, or whatever.

2    Q.    That being the medical floor, is that also

3    a crowded or overcrowded floor?

4    A.    It depends on --

5    Q.    What you have?

6    A.    -- what I have.

7    Q.    How about level 2, the floor where you have

8    those folks who are on crutches and wheelchairs?

9    A.    One in the cube, one working the inmates.

10   If a person is in need of assistance getting out

11   of a bed into a wheelchair, we bring one of the

12   deputies from 3 down to 2, and they get

13   underneath each arm and help them over in their

14   wheelchair.  Same for any special need that that

15   inmate has.

16   Q.    Let's talk about if you -- well, I'm going

17   to say a perfect day where you've got everybody

18   there, all your deputies, they're not having to

19   go to the clinics, they're not having to

20   transport.  Is the jail a safe place for inmates

21   on those days?

22   A.    Not currently, because it's still

23   overcrowded.

1    Q.    What about when you have deputies that are

2    having to take prisoners to the clinics, having

3    to transport them to Bessemer or to Montgomery or

4    wherever, is the jail a safe place for inmates

5    then?

6    A.    No, sir.

7    Q.    Now, would it be fair to say from what

8    you're telling me, then, that this fact that it's

9    not safe for the inmates is because of the lack

10   of staffing?

11   A.    Yes, sir.  And it's not safe for my

12   deputies.

13   Q.    And that's another part.  When it's not

14   safe for the inmates, it's not safe for the

15   deputies or any civilian personnel.  Would that

16   be fair?

17   A.    No, it's not.

18   Q.    And could this be cured by an increase in

19   the funding for the sheriff's department?

20   A.    It could.

21   Q.    Back to the levels it was in 2008?

22   A.    Yes, sir, and the reopening of the Bessemer

23   jail where we'll have somewhere to put these

Exhibit C

( REPORT OF STEVE J. MARTIN )

PREPARED FOR THE U. S. DEPARTMENT OF JUSTICE

CIVIL RIGHTS DIVISION/SPECIAL LITIGATION SECTION

ON THE

JEFFERSON COUNTY JAILS, BIRMINGHAM, ALABAMA

APRIL 9, 1998

Hale 00326

# I. INTRODUCTION

I have been retained by the Civil Rights Division of the United States Department of Justice to examine the current conditions and operation of the Jefferson County Jails at Birmingham and Bessemer for the purpose of assessing current conditions, focusing on inmate safety and security.

# II. QUALIFICATIONS OF EXPERT

I am an independent consultant in the field of corrections with 25 years experience in correctional administration. During the course of my career I have made more than three hundred site visits/inspections to confinement facilities in more than 25 states ranging from halfway houses to super-maximum security facilities. I have provided consulting/expert services on jail and prison administration issues such as population management, classification, staffing, staff training, inmate discipline, use of force, administrative segregation, security practices, inmate grievances and inmate legal services. I have been qualified as an expert witness in the field of corrections and have testified as such on more than thirty occasions, most in federal courts. In Thomas v Gloor and Stubbs v Gloor (USDC for the Northern District of Alabama, CV 77-P-0066-S & CV 77-P-0132-S), the conditions case about the Jefferson County Jails, the court qualified me as an expert in August 1997. I am the co-author of Texas Prisons: And the Walls Came Tumbling Down (Texas Monthly Press, 1987) and have published articles on correctional subjects in Texas Lawyer, Law and Society Review, Focus (the journal of the National Conference on Crime and Delinquency), Texas Tech Law Review, and the Texas Observer. I have also served on the adjunct or visiting faculties of six universities including the University of Texas School of Law. Details of my experience may be found in my Curriculum Vitae, attached hereto as Exhibit A.

1

Hale 00327

## III. METHODOLOGY

The methodology employed to produce this report involved a three day site inspection of the Jefferson County Jails, in Birmingham and Bessemer, on March 10-12, 1998. In addition, I have reviewed documents produced prior to, during and after the site inspection. The document review included materials relating to the following areas of facility operations of both jails: incident reports, October 1997 thru February 1998; staffing rosters, February 1998; inmate disciplinary reports, October 1997 thru February 1998; jail inspection reports; select jail policies and procedures such as classification, inmate grievances, use of force & chemical agents, use of restraints; staff training documents; inmate handbook; monthly statistical reports; and population projection reports. During the course of the site inspection, I had ample opportunity to interview and question both staff and inmates. I conducted informal interviews of over hundred inmates and formal interviews with at least seven inmates. I reviewed inmate file information on these latter seven and others. I was accompanied during the three days by Lieutenant Glenn Anderson, a senior shift commander whose knowledge and experience in the Birmingham Jail is quite extensive. During the site inspection of the Bessemer Jail, the facility administrator, Captain Kilburn, was interviewed and provided all necessary information concerning the operation of that facility. Major Linn Moore, the chief administrator of the Jefferson County Jails was also available and directly participated in various phases of the site inspection.

In addition to the foregoing sources of information, I conducted a site inspection of both jails on July 22-23, 1997, in support of the RESPONSE OF THE UNITED STATES OF AMERICAN TO THE STATE DEFENDANTS' MOTION TO TERMINATE PREVIOUSLY GRANTED RELIEF. My declaration filed on August 1, 1997 in that matter is attached hereto as

2

Hale 00328

Exhibit B (hereafter referenced as "August Declaration").

## IV OBSERVATIONS AND FINDINGS

The following observations and findings are presented under seven topical headings: A) Facility Overview, B) Overcrowding, C) Staffing/Training, D) Booking & Reception, E) Classification & Inmate Management, F) Use of Force, G) Food Service, Physical Plant Maintenance & Fire Safety.

### A. Facilities Overview

The Birmingham and Bessemer Jails are both relatively new facilities, opened in 1984 and 1988, respectively. Both facilities are limited direct supervision jails, meaning that supervision of inmates is by officers who watch the inmates from a control room or from other areas outside the inmate housing areas. There are no officers stationed inside the housing areas. Officers can see into the dayrooms, but there is only a small window on the cell doors, so staff cannot see into the cells unless they enter the cellblock and stand close to a cell. The Birmingham facility houses inmates on eight floors while the first floor temporarily houses inmates booked into the jail. Each floor housing general population inmates has seven cellblocks or pods with a single outdoor recreation space. The Bessemer jail houses inmates on the second story of the facility with two tiers to a cellblock or pod with four pods on the North end and four on the South. The cellblocks are similar in both facilities: they have six or seven cells on a tier, and there are either one or two tiers to a cellblock. The typical cell in both the facilities is approximately 70 square feet; some have only one bed, but most have been equipped with a second bunk. Each cell is equipped with a small desk, a window, sink and toilet, and property boxes.

Hale 00329

## B. Overcrowding

The Jefferson County Jails are dangerously overcrowded. Both the Birmingham and Bessemer Jails were designed to single cell inmates. Their configuration and the size of the cells and dayrooms are based on single cell population numbers. The Birmingham Jail has a design capacity of 620, including special management and isolation cells. The design capacity for general population inmates is 584. The double cell capacity for general population inmates is 1035. The population on March 10, 1998 was 1358. Of these, 870 inmates were triple-celled in double-bunk cells designed for one inmate. 56 inmates were quadruple celled in double-bunk cells designed for one inmate. The typical general population cell at both facilities is approximately 70 square feet. Therefore, triple celled inmates are provided less than 24 square feet of living space while those inmates quadruple celled have less than 18 square feet. With both triple and quadruple celling there is virtually no unencumbered cell space which is clearly in violation of Paragraph 1 of the court's 1978 INJUNCTION in the Gloor cases (copy attached hereto as Exhibit C). On the fourth floor reserved for female detainees, 50 inmates were housed five to a cell in cells designed for three persons. Thus, 976 inmates (72%) in the Birmingham Jail were housed in cells where one or more inmates were sleeping on the floor. In July 1997, there were 804 inmates triple-celled with no inmates quadruple-celled with a total population of 1233.

The Bessemer Jail has a design capacity of 120, including special management and isolation cells. There are approximately 110 cells available for general population housing. The population of the Bessemer Jail on March 9, 1998 was 226. Over one-half of the available cells at the Bessemer facility house inmates on the floor.

4

As aforementioned, both the jails were designed for single cell capacity. Therefore, aside from the extreme crowding in the cells, the typical dayspace in a pod was designed for 12 inmates and must routinely accommodate 30 to 36 inmates. Such crowding in a small space creates fierce and dangerous competition among inmates for such basic services as phones, television, showers, seating as evidenced by the frequent and serious number of inmate-on-inmate assaults in typical housing unit (see below, Classification & Inmate Management).

The Jefferson County inmate population is growing steadily; between 1990 and 1997, the population doubled. Between January and July 1997, the population in the Birmingham jail increased by 10% with another 10% jump in just the last eight months. A 20% increase in the population for the last fourteen months is an alarming trend in and of itself, and frightening given the current conditions set out below. I was advised by Lt. Anderson that the inmate population had risen as high as 1445 on March 24, 1998. The increase from the July 1997 count (1233) to March 24th is 212 inmates which would fill a entire floor in the jail at double cell capacity, yet this number was absorbed without any additional capacity. These 212 inmates would also fill the Bessemer facility; however, it would be operating at over a 170% of its design capacity.

C. Staffing/Training

The Birmingham Jail is dangerously understaffed. The total number of detention officers currently assigned to the jail is 125 (1st Shift-42, 2nd Shift 42, 3rd Shift 32, 5-day positions 9). This number of officers yields a staff/inmate ratio of 1:11 (utilizing the population count of 1358 on March 10). Such a ratio is significantly below national averages for metropolitan jails which run between 1:4 and 1:5. When viewed in terms of the number of officers on a single shift at any given time, the understaffing is dramatic. On the night shift for February 1, 1998 there were

5

Hale 00331

twelve officers assigned to the housing areas of the facility yielding a staff/inmate ratio of one officer for every 110 inmates. The other two shifts on that date were operating with one officer for every 80 to 84 inmates. Incredibly, all three shifts operate without dedicated staff for the whole array of support and services activities such as escorts, searches, visiting, sick call, housing transfers, etc. Therefore, at peak periods in the 24 hour operation of the jail, an entire floor with some 200 inmates may have but a single staff member in the control center which should never be vacated.

The following three examples taken from the incident reports graphically illustrate the dangerous staffing levels at the facility. On January 22, 1998, an inmate advised the control room officer through the intercom that he needed to be moved from his 9th Floor, C-Block housing assignment. The control officer was without a floor officer and could not investigate the matter but advised the inmate that upon return of the floor officer, they would address his request. Prior to the floor officer's return, the inmate attempted to hang himself with sheet. By the time a floor officer was summoned and arrived, the inmate, whose door had been opened attempted to jump off the 2nd tier of the cellblock (see Uniform Incident/Offense Report [hereafter "Incident Report"], Case #98015518). On November 13, 1997, a medic was passing out night meds without an escort or a floor officer on the 8th floor. She was assaulted by the inmate, but broke free and left the floor, all without any officer observing the incident (see Incident Report, Case #97143493. On November 10, 1997, an inmate was threatening suicide, at which time her cellmate notified the control room officer who was the only officer on the floor. While awaiting officer support, the inmate started slashing herself with a razor blade and other inmates had to subdue her.

6

Hale 00332

Having reviewed every incident report from October 1997 thru February 1998, I was astonished at the number of assaults that occur in the dayspace of the housing units without officers observing them. A significant number of inmate assaults are reported by inmates, often times those inmates who have sustained injury seeking medical attention. Such a high number of assaults in a direct supervision jail should not occur unless floor officers are frequently and intermittently absence from their post. Given the lack of the aforementioned dedicated officers to perform the service and support activities, the foregoing examples are clearly not isolated incidents. Given the extreme crowding of the typical dayspace of a cellblock, constant floor officer coverage is critical to observe and intervene in altercations between inmates. More importantly, adequate officer presence in the housing areas is necessary to prevent the altercations in the first instance rather than just observe and intervene after they occur.

In addition to the lack of security in the housing areas, the delivery of inmate services also suffers. One of the most frequent complaints among inmates during the site inspection was the difficulty in gaining access to medical services which often times requires officer escort. I interviewed a number of inmates who complained that other inmates collected and distributed inmate mail. In fact, I spoke at length with an inmate who acknowledged he routinely performed these functions. Inmates also routinely complained of abbreviated visitation which when given the overcrowding and understaffing is hardly surprising. The substandard delivery of essential services to an inmate population certainly engenders tension both among inmates and between inmates and staff.

In addition to the understaffing at the line officer level, there are too few supervisors. The Birmingham Jail in addition to the chief administrator (Major) has but two slotted captain

Hale 00333

positions with three lieutenants as shift commanders and one administrative lieutenant. The training sergeant, which should be a full time task, routinely performs other time consuming functions at the jail such as serving on disciplinary committees and trying to develop and improve jail classification (see below, Classification & Inmate Management). Personnel is so lacking at the jail, that incident reports are not formally or routinely reviewed above the sergeant level (see below, Use of Force).

Currently, new officers are sent to a fourteen week state academy for police and given but one block of training specifically geared to correctional staff. The Training Sergeant advised that in the near future a two week block for corrections will be added to the state academy training for detention personnel. The state requires only 12 hours of annual in-service training but the Jefferson County Jails provide 40 hours. *(training officer program endorsed)*

While the Bessemer Jail does not have the severe staff shortages seen at the Birmingham Jail, it likewise does not have any dedicated officers for support and services activities. However, with a much smaller facility such a shortage is not as acute. The overall staff/inmate ratio at Bessemer is 1:5 with ratios in the 1:50 range per shift.

### D. Booking & Reception

Booking and reception officers appear to do a commendable job in processing new detainees in an expeditious fashion. According to Lt. Anderson, it is unusual for new books to take longer than two hours and rarely do they take longer than six. Once the receiving officer accepts a new detainee, he/she is immediately placed in a holding cell pending actual processing. Once processing begins, a Booking Questionnaire is completed. Therefore, it is not unusual, especially during peak activity, for inmates to be placed in holding cells for extended periods

8

Hale 00334

without any pre-classification screening. This is a dangerous practice given most of the holding cells at the Birmingham facility are not direct supervision or direct sight and sound holding cells The holding cells are not equipped with a two-way audio intercom system making voice *ARE* communication difficult (see Paragraph 10 of 1978 INJUNCTION in Gloor cases). Moreover, the questionnaire does not adequately screen for suicidal risk as it simply ask if the detainee has ever attempted suicide. There are no follow-up inquiries such as mental health commitment history, history of mental health problems, current family problems, job loss, death of loved ones, etc. The single question about attempted suicides should be modified to include contemplation of suicide.

The booking area does not have a detoxification cell that facilitates constant sight and sound observation by booking personnel from a fixed duty station. Such a configuration requires diligent rounding with direct periodic direct supervision contacts. On December 14, 1997, a intoxicated detainee was received in booking during the late afternoon. At 7:00 am the following morning he was found dead in a holding cell. The last reported contact in which personnel observed him moving or talking was at approximately 2:30 am. He had earlier been observed hallucinating and was described as "extremely intoxicated." Such an inmate would require direct supervision contacts at intervals more frequent than every four and one-half hours.

E. Classification & Inmate Management

An inmate classification system is necessary for the safe operation of a jail because it is the primary means to identify those inmates who present a serious threat to themselves, staff, other inmates or to the community. Such inmates can and should be assigned appropriate housing and supervision relative to the degree of assessed risk. Classification instruments must rely on a

9

Hale 00335

variety of information or risk assessment variables in order to make sound classification decisions. The Jefferson County Jails classify and house inmates based primarily on a single classification variable—whether the commitment offence is violent or nonviolent. Such classification factors as pre-trial/post-trial, felony/misdemeanor, prior assaultive convictions, prior escape history, vulnerability potential and past/present institutional history, are not routinely reviewed for classification purposes. In fact, the jails operate without any designated classification personnel. Booking officers simply and quickly complete a one page form based on current booking/arrest information.

Both jails are so overcrowded, with so few empty beds at any given time, that space availability drives housing assignments. Even with a sound classification instrument, overcrowding would compromise any attempt to fully implement a classification system. Failure to properly classify a large metropolitan inmate population at a facility that is overcrowded and understaffed will result in a management nightmare in which inmates are left often left to their own unlawful/unwanted devices to manage the housing areas. A review of incident reports for the month of October 1997 yielded the following statistical data utilizing key indicia of inmate management areas.

- 34 known/reported inmate assaults/fights
- 20 applications of chemical agent "freeze" including one inmate confined to a wheelchair
- 3 correctional officers assaulted
- 3 inmates shackled and chained to their beds
- 2 inmates released from custody by error

10

Hale 00336

2 inmate attempted suicides

A review of all incident reports (October 1997 thru February 1997) provide a frightening picture of what happens when unclassified inmate populations are housed in a spatially dense environment without proper supervision. Because of the lack of staff, inmates are locked out of their cells and left in the crowded dayspace for most of their waking hours (jail staff recently conducted an "experimental roll out" program to allow inmates in and out of their cells every hour or two hours in order to reduce the overcrowding in the dayspace but found, among other things, it was too staff-intensive). These small overcrowded dayrooms operate as virtual "greenhouses" for violence and extortion over such basic issues as food, telephones, and seating space. Group assaults ("cludges") wherein several inmates assault a single inmate are commonplace. There are at least three major street/inmate gangs represented in the inmate population--the Bloods, the Crips, and the Disciples. In order to avoid violence by members of one gang against members of another, jail staff attempt to separate members of the different gangs, but are very limited in their ability to do so because of space limitations and an adequate classification system. Most of the "cludging" is related to this gang activity.

In addition, vulnerable inmates such as the mentally retarded, mentally ill, and the passive, are often the object of inmate abuse. The following representative examples provide graphic evidence of the extent of this violence in the housing units. The following examples are not isolated incidents and reflect only a fraction of the total number of reports reviewed.

Incident Report Case # 98021093--On February 5, 1998 an assault occurred in the 8th floor dayspace in which one of the inmates sustained serious head injuries requiring surgery on his face resulting in a partial loss of facial nerves. The assault was broken-up by inmates having started on an upper tier and moving to the first floor. The victim of the assault was interviewed and claimed he was attempting to

11

Hale 00337

intervene on behalf of an weaker inmate who had missed numerous meals due to other inmates repeatedly taking his meal trays. The inmate who was losing his meal trays was likewise interviewed and confirmed inmates had been taking his meal trays. At the time of the interview, he clearly exhibited characteristics of a vulnerable offender with serious mental health problems. The assailant had previously assaulted another inmate in the same dayspace (Incident Report, Case# 97114621). This assault resulted in two black eyes. Just over two weeks after the February 5th, the assailant assaulted yet another inmate over racial slurs (Incident Report, Case# 98025482). At the time of the site inspection, the assailant remained housed in a general population cellblock.

Incident Report Case # 98012925--On January 11, 1998 an inmate was attacked by two other inmates on the 8th floor when they threw a towel over his head and repeatedly struck him and then attacked him with a razor. He sustained multiple injuries to his head and had slashing cuts on his right forearm, left hand and left ear.

Incident Report Case # 97286983--On November 28, 1997 four inmates were involved in a fight on the 7th floor that was precipitated by an earlier fight involving two other inmates.

Incident Report Case # 97114705--On November 18, 1997 an inmate requested to be moved from the 8th floor as inmates as other inmates had been taking his meal trays for some two months and "he couldn't take it anymore."

Incident Report Case # 97111169--An inmate on the 9th floor was assaulted by three other inmates and sustained head injuries and a bloody nose.

Incident Report Case # 973303--An inmate on the 7th floor was assaulted by two inmates, one of whom had just been moved to the cellblock from the 8th floor for being a member of a "cludge crew."

Incident Report Case # 97113219--An inmate was assaulted by five inmates and was left dazed and bleeding from the mouth. Two of his assailants explained that they assaulted him as an act of reprisal for an earlier assault.

Incident Report Case # 97112907--An inmate was assaulted with a razor by his cellmate for making excessive noise and sustained a wound to his chest area.

Incident Report Case # 9711604--Two inmates had an altercation over a TV program.

Incident Report Case # 97116304—Three inmates had an altercation over use of

12

Hale 00338

the telephone.

    o    Incident Report Case # 9711638—Two inmates had an altercation over a card game.

    o    Incident Report Case #97102879—Two inmates had an altercation over use of the telephone just before the noon hour on October 11, 1997, which resulted in an eye injury to one of the inmates. A medic was unavailable to examine the injury. After waiting some 7 hours, officers on their own initiative sent the inmate to the hospital at which time the injury was diagnosed as a very serious possibly requiring surgery with the prospect of permanent damage to the eye.

    o    Incident Report Case #97104537—At approximately 8:00pm on October 17, 1997 officers were advised that an inmate was suffering from an asthma attack. When officers arrived, they observed the inmate wrapped in a blanket experiencing difficulty breathing. After removing the blanket, officers observed severe swelling around the inmate's eyes and mouth. Questioning revealed that the inmate had been assaulted by a unknown number of inmates "early during the afternoon but was not reported..."

[Note: the previous four incidents as well as many others have occurred on the 8th floor which is typically the most crowded of all the floors, and as aforementioned, houses violent offenders.]

The above incidents and many others of similar nature provide clear evidence of a pattern harm to inmates that is alarming in its scope, seriousness and frequency. Perhaps one of the most telling encounters I had with inmates while touring the Birmingham Jail was a random inspection of a cell on the 9th floor in which three inmates were housed on D block. One of the inmates had a serious eye injury he had received earlier in the day. Both of his cellmates had likewise been involved in altercations within the previous two weeks. At the Bessemer Jail, I observed a particular cellblock with a number of youthful looking offenders in the dayspace on the 1st floor, some of whom were watching music videos on the TV. Huddled together on the far end of the 2nd tier run were three or four elderly appearing inmates. After interviewing all three inmates, it

13

Hale 00339

was clear that they had acceded their free and frequent access to the dayroom to the younger inmates. Even though the reported incidents of violence and extortion are alarmingly high at both facilities, a significant level of violence occurs that goes on unreported due to fear of reprisal or simply because staff are not in a position to observe it.

### F. Use of Force

A review of the Jefferson County Jails policies and procedures on the Use of Force and Restraints reveal some glaring deficiencies entirely consistent with a significant number of incident reports reviewed in which serious questions are raised, some of which are detailed in the example set out below. The Use of Force policy does not even define force adequately (it is defined as an incident in which a deputy causes a "visible" injury to an inmate; an incident in which a deputy "strikes or punches a person or causes a person to go down to the floor;" an incident in which a deputy uses a chemical agent. Thus, a pain compliance hold in which the inmate remains standing causing no visible injury is not technically defined as an application of force). The policy does not require officer witnesses to file reports and requires no administrative review beyond the sergeant's level unless he/she determines a "complete investigation" is needed.

Chemical agents may be applied upon an inmate failing to comply with lawful orders or instructions and "showing no intention" of complying. There are no prohibitions regarding the use of chemical agents on inmates locked securely in their cells, or applying agents to inmates with medical conditions. Moreover, there is no policy that ensures appropriate decontamination procedures.

The policy on mechanical restraints does not identify the circumstances in which various restraints or methods may properly be applied. The fully array of approved restraints is not even

14

Hale 00340

listed. Consultation with health care professionals for the application of certain kinds of potentially dangerous methods, e.g., bed restraints, is not required. Such authority rests entirely with the shift sergeants. Inmates may be restrained up to four hours without any medical health care intervention.

Deficiencies in such policies are often magnified in facilities that are overcrowded and understaffed. More importantly, if supervisory personnel are exercising limited oversight on the use of force practices employed by their line level personnel, detection of possible wrongdoing is virtually impossible. This is certainly the case at the Birmingham Jail as illustrated by the following examples.

- Incident Report Case # 97111464--An inmate was given a choice of housing in one of two cellblocks with the lowest inmate counts. After refusing to enter either cellblock, he was sprayed with a chemical agent (hereafter "freeze").

- Incident Report Case # 98072497--An inmate who refused to take his medication was "pinned down on the bed where he continued to resist until sprayed with Deep Freeze defensive spray." [Note: I was unable to locate any policy statement that addressed applications of force to inmates refusing to take medication which is important given the very limited circumstances in which force may be used in such situations.]

- Incident Report Case #97101974--Three inmates on the 9th floor had been "kicking and hitting their cell doors" during a series of disturbances including inmates flooding the cellblock tier. Three inmates were "shackled and chained to their beds for a period of time to restore order and protect the security of the jail." One of the inmates was sprayed with freeze just prior to application of the restraints. Such an unauthorized practice is considered dangerous and unnecessary given the number of more effective and safe methods available. These inmates remained restrained for some four hours at which time waist cuffs were applied.

- Incident Report Case # 97101940--An inmate confined to a wheelchair was moved to a consultation room after using abusive language and hitting a dayspace door. As officers were helping the inmate through a door, he continued to use abusive language. The reporting officer sprayed the inmate with freeze to "avoid injury to himself or the inmates."

15

Hale 00341

Incident Report Case #9802788--On February 11, 1998 at approximately 8:14pm, 3rd floor officers observed an inmate engaged in "suspicious activity" in 3A2. Two officers checked on the inmate and saw no injuries. Within minutes, two inmate workers reported that the inmate was injuring himself. The two officers returned to his cell and observed the inmate banging his head on the corner of his cell walls. One of the officers noted blood on the wall where he was banging his head. Inexplicably, the two officers simply instructed him to stop, left the cellblock and returned to the control area. Moments later, the inmate was observed on the monitor banging his head "forcefully" on the wall. As the two officers were returning to his cell, they were joined by other officers, one of whom sprayed the inmate with a chemical agent "due to the victim's bloody condition." The inmate fell "limp to the floor" and officers "drug the victim into the dayspace" leaving a trail of blood across the dayspace floor. Just 11 days prior to this incident, the same inmate, housed in the same cell, was hospitalized due to large swelling on his forehead caused from hitting his head against the cell wall. One week·after the February 11th incident, the inmate was place in a restraint chair because he was again hitting his head on the corner of his cell.

[Note: I reviewed the photos taken of the cell and dayspace in the immediate aftermath of this incident. Given the large pool of blood collected on the floor of the cell, serious questions should be raised regarding the length of time this inmate was allowed to self-mutilate before intervention by officers. Serious questions should be raised about both officers leaving the inmate alone after having observed him banging his head on the wall with enough force to leave blood. Serious questions should be raised regarding the use of a chemical agent in this situation. Serious questions should be raised regarding the method used to remove the inmate from his cell. Incredibly, there is no evidence that any of these questions were raised as the reports were signed off by only the supervising sergeant, who was directly involved in the incident. In fact, none of the foregoing incidents reflect any reviews or investigations above the level of sergeant.]

G. Food Service, Physical Plant Maintenance & Fire Safety

Both the Food Service Manager and Director of Maintenance were interviewed during the site inspection. Currently, Food Service operates 24 hours a day serving some 4500 plus daily meals. Given current levels of food service personnel and equipment, any further increases in daily output are not feasible. Improved food service equipment is badly needed with current levels of daily output. The kitchen is operating without a dishwasher conveyor, adequate cooking pots,

16

Hale 00342

mixers, and cold storage capacity. Even with herculean efforts by food service personnel, the quantity, quality and delivery of meals is compromised. These equipment deficiencies will grow more acute overtime at present levels of operation further aggravating the overall overcrowding at both facilities. The Director of Maintenance cited such problems as difficulties maintaining necessary plumbing supplies and a hot water boiler over stressed from the overcrowding. Preventative maintenance is virtually impossible given all the reactive maintenance problems that consume virtually all the time of the six maintenance personnel. The absence of preventative maintenance will continue to accelerate the deterioration of the overall physical plant causing more frequent and acute problems in just keeping the essential features of the plant operating.

It should also be noted that fire evacuation training becomes more critical in overcrowded facilities. However, with such staff shortages as aforementioned, such essential training often is not conducted. Such is the case at the Jefferson County Jails. Moreover, pursuant to Paragraph 8 of the 1978 INJUNCTION in the Gloor cases, fire evacuation plans must be posted in all living areas of the facility. While plans are posted in some areas, others are not. The fire evacuation training should include proper maintenance of these postings in all areas at all times.

## V. CONCLUSIONS

The current operation of the Jefferson County Jails constitute immediate, ongoing and serious risks of harm to both staff and inmates. The extent of the overcrowding itself creates dangerous conditions. The Birmingham facility is operating at over 200% of its design capacity with over 950 inmates housed in cells where one or more inmates sleep on the floor. This sheer overcrowding is further aggravated by acute understaffing such that individual officers are required to provide security for over 100 inmates. This understaffing and overcrowding is

17

Hale 00343

*...working on sheep/wow...*
*pellition / APX du ...*

combined with inadequate classification practices, thus giving rise to an environment in which inmate violence is rampant. These conditions are occurring at facilities that are already stressed with no reduction in populations forecast. In fact, the populations have steadily increased the past several years with a 10% jump in just the last eight months. Absent development and implementation of corrective measures to ameliorate exiting conditions, the already dangerous conditions set out herein will become even more prevalent, serious and frequent with major disturbances/dissolution inevitable.

Steve J. Martin

Hale 00344

EXHIBIT A

Hale 00345

## CURRICULUM VITAE

**NAME:** Steve J. Martin

**ADDRESS:** 8513 Adirondack Trail
Austin, Texas 78759

**TELEPHONE:**
Office (512)346-7607
Fax     (512)794-8883
E-Mail  sjmart@onr.com

**DATE OF BIRTH:** August 27, 1948

**EDUCATION:**

**1973**
Bachelor of Science
Criminology and Corrections
Sam Houston State University
Huntsville, Texas

**1974**
Master of Arts
Correctional Administration
Sam Houston State University
Huntsville, Texas

**1981**
Juris Doctor
University of Tulsa
School of Law
Tulsa, Oklahoma
(admitted Texas State Bar-
Card #13106550)

**EMPLOYMENT:**

**1987-Present**
Self-employed Corrections
Consultant and Attorney.

**1986-1987**
Gray & Becker, Attorneys at
Law.  General practice law
firm engaged in litigation,
administrative law, civil
rights & legislative work.

**1985-1986**
Texas Attorney General's Office
Special Assistant Attorney General;
worked as an consultant to the
Chief of Enforcement Division
on litigation involving the
Texas Department of Corrections.

(Vita current as of 1-98)

Hale 00346

1981-1985

Texas Department of Corrections
Executive Assistant (1984-85)
General Counsel (1983-85)
Legal Counsel (1981-83)
Huntsville, Texas

As Legal Counsel I served as the
in-house attorney on class
action litigation. In 1982, I
was given the responsibility for
providing the primary case
administration of RUIZ v ESTELLE
(class action conditions suit
in which virtually all opera-
tional aspects of the prison system
subject to court orders). From
1983-85 I served as the chief
legal officer of the department.
I also served as the liaison to
the Office of the Special Master
in RUIZ as well as liaison to
the Attorney General's Office
and the legislature. From 1984
I also served as the Director's
Executive Assistant, an operations
position in which I was the
third ranking official in the
department.

1980-1981

Tulsa County DA's Office
Assistant District Attorney
Tulsa, Oklahoma

As an Assistant District Attorney
provided representation to county
jail officials on civil rights
litigation filed by county jail
prisoners. I also drafted a set of
jail standards adopted by the district
judges for operation of the jail.

Hale 00347

1994-Present — Retained as consultant, MORRIS v VOINIVICH; conditions litigation involving Southern Ohio Correctional Facility, Lucasville, Ohio.

1994-Present — Retained as expert witness, SHEPPARD v PHOENIX; excessive use of force litigation involving New York City Department of Corrections, Rikers Island.

1994-Present — Retained as expert witness, ALLEN v CHISHOLM; excessive use of force litigation involving Montana State Prison.

1995-Present — Retained as expert witness, BOLTON v COOMBE; litigation involving double celling practices at Woodbourne Correctional Facility, New York.

1996-Present — Retained as expert witness, SOLOMON v DELLANA; litigation involving excessive force at Allegheny County Jail, Pittsburgh.

1996-Present — Retained as expert, LEE v COUGHLIN; litigation involving punitive segregation at Sing Sing/Southport prisons, New York.

1997-Present — Retained as expert, CHASE V GRANT; litigation involving excessive force at Maryland Correctional Adjustment Center, Baltimore, Maryland.

1997-Present — Retained as expert, CHRISTENSEN v SULLIVAN; litigation involving conditions at the Milwaukee County Jail.

1997-Present — Retained as expert, BLACKMON v McCOTTER; litigation involving stabbing death of inmate at the Central Utah Correctional Facility.

1997-Present — Retained as expert, CURRY v SCOTT; litigation involving excessive force at the Southern Ohio Correctional Facility.

Hale 00348

1997-Present

Retained as expert, CLARK v CALIFORNIA DOC; litigation involving treatment of developmentally diabled prisoners in the California DOC.

1992-1995

Retained as expert witness, MADRID v GOMEZ; conditions litigation involving Pelican Bay State Prison, California.

1996

Retained as expert witness, COLLINS v ALGARIN; litigation involving exessive force at Montgomery County Jail, Pennsylvania.

1995

Guest Lecturer on "The Role of Experts in Prison Litigation", National Association of Attorneys General Annual Conference, Little Rock, Ark.

1995

Testified before the United States Senate Judiciary Committee as a panel member on Prison Litigation Reform Act.

1994-1995

Retained as expert witness by the New York Attorney General's Office, BIN-WAHAD v COUGHLIN; litigation involving claim of retailtory transfer in the New York Department of Corrections.

1993-1995

Retained as consultant to the Texas Comptroller of Public Accounts; Performance Review of the Texas Department of Criminal Justice.

1991-1993

Gubernatorial appointee to the Texas Punishment Standards Commission. Vice-chair, Policy Development Sub-committee.

1989-1993

Retained as consultant and expert witness by Texas Attorney General's Office on prison and jail litigation.

1992-1993

Retained as consultant, BENJAMIN v ABATE; princial author of Reports of Plaintiffs' Expert Consultants on Conditions in the New York City Jails. Legal Aid Society, New York City.

| | |
|---|---|
| 1991-1992 | Staff Director, Study Committee on Judicial Education, Texas Supreme Court; principal investigator for Report on Judicial & Court Personnel Education Programs. |
| 1990-1992 | Retained as expert witness and consultant, NORMAN v CELESTE; crowding litigation involving the Orient Correctional Facility, Columbus, Ohio. |
| 1990-1992 | Retained as expert witness and consultant, JENSEN v CLARKE; crowding litigation involving Nebraska State Prison, Lincoln, Nebraska. |
| 1990-1992 | Retained as expert witness, PATTERSON v TRICKEY; AIDS segregation litigation involving Missouri State Prison, Jefferson City, Missouri |
| 1989-1993 | Retained as consultant on litigation involving numerous county jails including Detroit, Seattle, Houston, Austin and San Antonio. |
| 1989-1991 | Assisted Texas Legislature on the development of criminal justice legislation, 71st and 72nd Sessions. |
| 1988-1989 | Gubernatorial Appointee to Texas Council on Offenders with Mental Impairments; member of Executive Committee and Chairman of Legislative Committee. |
| 1986-1990 | Retained by Corrections Corp.of America, Nashville, Tenn., to assist in the development and operation of private prison facilities in Texas. |
| 1988-1992 | Employed as expert witness by Prison Law Office, San Quentin on litigation involving Vacaville, San Quentin and Tracy prisons. |

Hale 00350

1987-1993

Employed as expert witness by Prisoners
Legal services of New York on litigation
involving Attica and Elmira prisons.

1987-1989

Employed as expert witness by NAACP
Legal Defense Fund, New York on death
row conditions litigation in Missouri
and Arkansas.

1988

Technical Assistance Consultant,
National Institute of Corrections
Boulder, Colorado.

TEACHING EXPERIENCE:

1990

Southwest Texas State University
San Marcos, Texas; adjunct faculty-
taught corrections course.

1989

St. Edwards University Austin, Texas;
adjunct faculty-taught course on
American prisons.

1986

University of Texas School of Law
Austin, Texas; visiting faculty-
taught seminar on institutional
reform litigation.

1979-1981

Langston University Tulsa, Oklahoma;
adjunct faculty-taught probation and
parole, corrections, and criminology
courses.

1976-1977

Pan American University, Edinburg,
Texas; adjunct faculty-taught corrections
courses.

1973-1974

Sam Houston State University
Huntsville, Texas; Graduate Fellow-
taught course in social problems.

PUBLICATIONS AND PAPERS:

Martin, Steve J., and Sheldon Ekland-Olson
_Texas Prisons: The Walls Came Tumbling Down._
Austin: Texas Monthly Press, 1988.

Ekland-Olson, Sheldon and Steve J. Martin,
"Organizational Compliance with Court-Ordered Reform",
22 Law and Society Review 359, 1988.

Martin, Steve J., "Prisoners' Rights", Texas Tech Law Review,
Volume 20, Symposium 1989, Number 2.

Martin, Steve J., "Texas Prisons: A Brooding Crisis Behind
Bars", Texas Lawyer, March 13, 1989.

Martin, Steve J., and Sheldon Ekland-Olson, "Ruiz, A
Struggle Over Legitimacy", _Courts, Corrections and the
Constitution: The Impact of Judicial Intervention on
Prisons and Jails,_ edited by John J. DiIulio, Jr.,
Oxford University Press, 1990.

Martin, Steve J., "The Calling of Texas", Texas Observer,
January 11, 1991.

Martin, Steve J., "An End to Ruiz: Shifting the Debate from
Rhetoric to Reason", Texas Public Policy Foundation, April 1995.

Martin, Steve J., "Prison Reform Litigation: Shifting the Debate
From Rhetoric to Reason," Alan Fortunoff Criminal Justice
Colloquium, Center for Research in Crime & Justice of New York
University School of Law, February 26, 1996.

Grant, Darlene and Steve Martin, "Should Prison Reform Litigation
Be Curtailed?", National Council on Crime and Delinquency _Focus,_
May 1996.

Martin, Steve J., "Sanctioned Abuse", _Building Violence: How
America's Rush to Incarcerate Creates More Violence,_ edited by
John May, Sage Publications, Inc., forthcoming 1998.

Hale 00352

EXHIBIT B

Hale 00353

GEORGE THOMAS, et al.,          )
                                )
        Plaintiffs,             )
                                )
        v.                      )        CIVIL ACTION NO.
                                )        CV 77-P-0066-S
TOM GLOOR, et al.               )
                                )
        Defendants.             )
                                )


WILLIE ROY STUBBS, et al.       )
                                )
        Plaintiffs,             )
                                )
                                )        CIVIL ACTION NO.
                                )        CV 77-P-0132-S
TOM GLOOR, et al.               )
                                )
        Defendants.             )
                                )
                                )

## DECLARATION OF STEVE J. MARTIN

Pursuant to 28 U.S.C. § 1746, I, Steve J. Martin, declare as follows:

1. I am over the age of eighteen and competent to make this statement.

2. I am an independent consultant in the field of corrections with almost 25 years experience in correctional administration. My resume is attached at the end of this declaration. I began my career as a correctional officer at the Ellis Unit of the Texas Department of Corrections in 1972. I have subsequently served as a casework intern in mental health programs with the

Hale 00354

Federal Bureau of Prisons at the Federal Correctional Institution, Fort Worth, Texas; as a probation officer for the United States Probation and Parole office; and as an Assistant District Attorney in Tulsa, Oklahoma defending jail officials in civil rights litigation. In 1981 I joined the Texas Department of Corrections at Legal Counsel, and subsequently as General Counsel and Chief of Staff. I later served in the Texas Attorney General's Office as a Special Assistant Attorney General and as a consultant on prison and jail litigation.

3. In my service with the Texas Department of Corrections since 1981 I was involved in the development of policies and procedures in the areas of administrative segregation, inmate disciplinary procedures, inmate classification, use of force policies and procedures, and numerous other operational issues. Much of this work was related to compliance with court orders in Ruiz v. Estelle, the statewide prison conditions litigation brought by prisoners and the U.S. Department of Justice against the Texas Department of Correction. As Legal Counsel and General Counsel, I was responsible for the implementation of policies and the monitoring of compliance with those policies pursuant to the orders in Ruiz. As Chief of Staff I supervised the newly created office of Compliance, which took over the task of compliance monitoring. As Legal Counsel and General Counsel, I routinely visited prisons both in connection with Ruiz and other litigation and in connection with in-house agency investigations, e.g. of allegations of staff misconduct. As Chief of Staff, I was third the ranking official in the department and visited prisons nearly every week.

4. As an independent consultant, I have been retained by plaintiffs' counsel in numerous cases, and on several occasions by jail officials or other local authorities. I have made several hundred site visits to an estimated 300 prisons and jails outside the Texas Department of

-2-

Hale 00355

Corrections, including, for example, state prisons in Arkansas, Missouri, Nebraska, Nevada, New Mexico, Washington, Ohio, Montana, Wyoming, Puerto Rico, New York, and California; and local jails in Lauderdale, Gulfport, and Grenada, Mississippi; Owensboro, Kentucky; Seattle, Washington; Houston, San Antonio, Austin and Lufkin, Texas; Detroit, Michigan; and New York City.

5. I have qualified as an expert in the field of corrections and have testified as such on more than thirty occasions, most in federal courts. I am the co-author of Texas Prisons: And the Walls Came Tumbling Down (Texas Monthly Press, 1987) and have published articles on correctional subjects in Texas Lawyer, Law and Society Review, Focus (the journal of the National Conference on Crime and Delinquency), Texas Tech Law Review, and the Texas Observer. I have also served on the adjunct or visiting faculties of six universities including the University of Texas School of Law.

6. In my career in corrections, I have spent countless hours observing and speaking with both inmates and staff in prisons and jails and evaluating their policies, procedures, and practices.

7. I was retained as an expert in this case by the United States Department of Justice. At the request of the Justice Department, I conducted a site visit of the Jefferson County Jails, in Birmingham and Bessemer, on July 22-23, 1997, to evaluate current conditions and the potential impact if the State of Alabama stopped or slowed its removal of state inmates from the Jails. I was asked to look especially at the impact, if any, of overcrowding on conditions at the Jails, and this affidavit is correspondingly focused.

8. During my visit, I toured the Jails and interviewed a number of Sheriff's Department

-3-

Hale 00356

staff members, at both facilities, as well as the county official responsible for jail maintenance. I also reviewed numerous documents and spoke with a number of inmates.

9. This declaration is based on the information obtained during that visit, and my expertise in corrections.

The Jails: Background

10. The Birmingham and Bessemer Jails are both relatively new facilities, opened in 1984 and 1988, respectively. The cellblocks are similar in both facilities: they have six or seven cells on a tier, and there are either one or two tiers. Each cellblock includes a dayroom adjoining the cells, with tables and chairs, a toilet and a shower.

11. The typical cell in both the Birmingham and the Bessemer Jail is approximately 70 square feet; some have only one bed, but most have been equipped with a second bunk. Each one has a small desk, a window, and a sink and a toilet. In both facilities, each cell typically houses one to three inmates. If there are more inmates than beds, one or more inmates sleep on a mattress on the floor. (The cells used to house women in Birmingham are bigger, and hold more people; they each have three beds, and house four or five inmates.)

12. In general, inmates are confined to their cellblocks essentially 24 hours each day. They spend nights and several hours of each day in their individual cells, with their cellmates. The remaining time, inmates are required to be in the dayrooms. Meals are served in the cellblocks, and inmates eat them in the dayrooms. (Twice a week, inmates spend an hour or so in a covered outdoor recreation space. There are also occasional GED classes and chapel, for which inmates leave their cells. In addition, inmate trusties or workers perform job duties that can require them to go other places in the Jail.)

-4-

Hale 00357

13. Both Jails are direct observation facilities, meaning that supervision of inmates is by Sheriff's Deputies who watch the inmates from a control room or from other areas outside inmate housing areas. Staff can see into the dayrooms, but there is only a small window on the cell doors, so staff cannot see into the cells unless they enter the cellblock and stand close to a cell.

14. The Birmingham Jail is a highrise building; inmates are housed on eight floors. The typical floor has seven separate cellblocks, each assigned a letter (A-G), and an outdoor recreation space. The Bessemer Jail is a two story facility, with all the inmates housed on the second story. It is divided into North and South sides, and each side has four cellblocks, and an outdoor recreation space.

15. Both the Birmingham and Bessemer Jails were designed to be single-cell jails. Their configuration and the size of the cells and the dayrooms are based on single cell population numbers.

16. The Birmingham Jail has a design capacity of 620, including special management and isolation cells. Including only ordinary inmate housing, the capacity is 584. If every ordinary housing cell were double bunked, the ordinary housing capacity would be 1,035 (one cellblock is unoccupied at any given time, so that it can be painted). The population of the Birmingham Jail on July 22, 1997 was 1233. Of these, 804 were living tripled up in double-bunk cells designed for one inmate. (Triple celling is especially prevalent on the eighth and ninth floor, where most of the inmates categorized as "violent" are housed.) In addition, 52 female inmates were housed four women to a three-person cell, and 35 female inmates were housed five women to a three-person cell. Thus, in total, 891 inmates (72%) in the Birmingham Jail were housed in cells where one or more persons were sleeping on the floor.

Hale 00358

17. The Bessemer Jail has a design capacity of 120, including special management and isolation cells. There are approximately 110 cells available for ordinary housing. The population of the Bessemer Jail on July 22, 1997 was 209. There were 52 inmates, or one quarter of the population, living tripled up in cells designed for one, and with beds for two.

18. The Jefferson County inmate population is growing steadily; between 1990/91 and 1996/97, the population doubled. Between January and July 1997, the population in the Birmingham Jail increased by 10%.

19. Of the 1442 inmates housed in both Jails on July 22, 1997, 182 were state inmates, either newly eligible for transfer, or already processed at a state facility, but housed temporarily at the Jails in order to go to court or for some other reason. According to jail staff, the state takes inmates at the rate of 28 per week.

20. Although inmate population has doubled in the past six years, there has been no concurrent increase in the number of security staff at the Jails. The number of security officers has stayed constant since 1988, at 182 (140 at the Birmingham Jail, creating a staff:inmate ratio of approximately 1:9, and 42 at the Bessemer Jail, creating a staff:inmate ratio of approximately 1:5). These officers staff both facilities, twenty-four hours a day, every day.

Inmate Management

21. Based on their commitment offense and whatever criminal history is available to them, jail staff categorize each inmate as "violent" or "non-violent." State and county inmates, pre-trial or post-trial, are all housed together, but staff try to separate the "violent" and "non-violent" inmates.

22. In the Birmingham Jail, one floor houses only female inmates, and the rest of the

-6-

Hale 00359

floors house only male inmates. Of the seven male floors, one floor houses inmate trusties, two floors are medical and other special management, and four floors are general population. Generally, two general population floors are used to house only inmates categorized as "violent" (including one maximum security cellblock for difficult to manage inmates). One floor has only "non-violent" inmates. One floor has a "violent" cellblock, five "nonviolent" cellblocks, and a protective custody/administrative segregation cellblock.

23. In the Bessemer Jail, the North Side is used to house general population inmates classified as "violent." The South Side houses "non-violent" general population inmates, trusties, and inmates with special medical needs.

24. There are at least three major street/inmate gangs represented in the inmate population — the Bloods, the Crips, and the Disciples. In order to avoid violence by members of one gang against members of another, jail staff attempt to separate members of the different gangs, but sometimes cannot, because of space limitations.

**Physical Plant Maintenance**

25. The fact that both Jefferson County Jails are operating at over double their design capacity causes much-accelerated deterioration of the physical plants. So much reactive maintenance is necessary that no preventative maintenance is being done. According to county officials, the County is just barely able to maintain the plumbing, locking mechanisms, food service, and security equipment. For example, the food service at the Birmingham facility runs 24 hours a day, to serve the requisite 4400 meals; no expansion of this number is feasible.

26. At any given time, one entire cell block in the Birmingham Jail cannot house inmates, because it is being painted. (Painting the entire facility at this rate takes over a year, and

-7-

Hale 00360

when it is completed, maintenance workers start over again.) Painting the Bessemer facility also requires emptying one cell block at a time, but only for a month or two of the year.

## Conclusions

27. The Jefferson County Jails are seriously overcrowded and understaffed. The result is a currently unsafe, dangerous jail. Right now, the Jails are the sites of frequent fights, group assaults, and extortion. Any population increase would further aggravate the current unsafe conditions. To increase the population by one hundred inmates — four weeks of state transfers — would render the situation untenable.

28. Because there are so few empty beds at any given time, even with triple celling, any attempts at classification at the Jails are compromised. One of the purposes of classification is to attempt to separate inmates, so that inmates most likely to be preyed upon are kept apart from inmates most likely to commit acts of aggression, such as assault or extortion.

29. Space limitations make it difficult for the Jails to implement more than their one categorization (violent/non-violent, by offense). More refined management of inmates, taking their individual characteristics (such as any history of institutional predatory behavior) is difficult given the scarcity of space to single cell dangerous or vulnerable inmates.

30. The Jails' practice of barring inmates from their cells, requiring them to stay in the dayroom for extended periods in such crowded conditions, creates dangerous situations in several ways. First, the sheer number of inmates crowded together — 29-35 — in a dayroom intended for one-half to one-third as many creates tension and leads to violence. Second, it is impossible for so few staff to know what is going on among such large groups of inmates, in order to supervise them. Finally, the practice leaves an inmate unable to avoid a violent

-8-

Hale 00361

confrontation, if he knows that trouble is brewing. An inmate who has been threatened with assault might, for example, be able to avoid the situation if he could stay in his cell for a period of time. If there were more staff or fewer inmates, it would be possible to do hourly "lock-in/lock-outs," so that inmates could be allowed to decide whether they wanted to stay in or out of their cells at any given time.

31. My review of the documentation and interviews of inmates reveals that these conditions do indeed have the expected result. There are very frequent fights at the Jails, often leading to injury. There are group assaults, in which a large group of inmates gang up on one or two victims. This type of assault occurs frequently enough that the inmates have a name for it — "cludge." The Jails' incident reports and other documents are replete with examples of violence. It is my expert opinion that this violence is caused, directly and indirectly, by overcrowding and understaffing, and that its level would increase if the population of the Jails is allowed to expand.

Hale 00362

---I make the foregoing statement freely and voluntarily.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31st day of July, 1997, in Austin, Texas.

Steven J. Martin

STEVEN J. MARTIN

-10-

Hale 00363

EXHIBIT C

Hale 00364

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED IN CLERKS OFFICE
NORTHERN DISTRICT OF ALABAMA

OCT 16 1978

JAMES E. VANDEROFTH, CLERK
UNITED STATES DISTRICT COURT
BY

GEORGE THOMAS, JR., et al.,

    Plaintiffs,

v.

TOM GLOOR, et al.,

    Defendants.

WILLIE ROY STURMS, et al.,

    Plaintiffs,

v.

TOM GLOOR, et al.,

    Defendants.

CIVIL ACTION NO. 77-P-56-S

CIVIL ACTION NO. 77-P-132-S

## ORDER MODIFYING INJUNCTION

This cause is now submitted on the Motions to Modify Injunction filed on September 26, 1978, by the defendant Melvin Bailey, Sheriff of Jefferson County, and by the defendants Tom Gloor, Chriss Doss and Benjamin Erdreich and on plaintiffs' Response to Motions to Modify Injunction filed on October 2, 1978. Upon consideration of the foregoing and of the arguments of counsel, and for good cause shown, it is

ORDERED that the Injunction issued in this cause on August 26, 1978 be and the same is hereby modified as follows:

1. Paragraph 5 of said Injunction shall be modified to read as follows:

> 5. Within 30 days, dorms and day rooms shall be provided with sufficient direct or indirect illumination so that inmates may read without eye fatigue and strain. Additional illumination shall be provided in all hallways adjacent to all cells so as to allow the prison guards to observe the insides of all the cells.

2. Defendants are hereby given an additional 60 days from the date of this Order in which to comply with the requirements of paragraph 5 of the Injunction, as modified.

3. Paragraph 7 of said Injunction shall be modified to read as follows:

Hale 00365

7.  All cells, dorms and day rooms shall be provided with cold running water and a toilet flushable from the inside.  Additionally, all dorms and day rooms shall be provided with tempered and cold running water.  Access to tempered and cold running water shall be provided to all inmates immediately prior to their being placed in their cells for the night-time period.  The use of "oriental" floor toilets in isolation cells shall be discontinued immediately.  The defendant Bailey shall thoroughly clean and disinfect all showers and shall maintain them in such condition.  Vacuum breakers shall be installed on all toilets within sixty (60) days.

4.  Paragraph 10 of the Injunction shall be modified to read as follows:

10.  Guards shall be situated at all times to have voice contact by direct or electronic means with inmates held in isolation cells or in cells with no other inmates.  Guards shall physically observe the inmates in isolation cells or in cells with no other inmates at least once each half (1/2) hour.  All other inmates shall be so situated that they may be seen and heard on a regular basis by guards and have some method of communicating with guards in emergencies.

DONE and ORDERED this _13th_ day of _October_,
197_P_.

                    _signature_
                    UNITED STATES DISTRICT JUDGE

Hale 00366

Ø004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Southern Division

GEORGE THOMAS, JR., et al.,

    Plaintiffs,

    -vs.-

TOM OLCOR, et al.,

    Defendants.

NO. CA 77-P-66-S

FILED IN CLERK'S OFFICE
NORTHERN DISTRICT OF ALABAMA

AUG 2 0 1978

JAMES E. WOODRUFF, CLERK
UNITED STATES DISTRICT COURT
BY _____

WILLIE ROY STUDDS, et al.,

    Plaintiffs,

    -vs.-

TOM OLCOR, et al.,

    Defendants.

NO. CA 77-P-232-S

## INJUNCTION

The Defendants Tom Olcor, Chris Dass, Benjamin Erdreich, Mel
Bailey, and their agents, servants, and official successors (here-
after called "County Defendants"), and Larry Bennett, John E.
Vickers, Thomas F. Staton, Dr. Marion L. Carroll, Jr., Louis
Wilkinson, and W. F. Hammer, and their agents, servants, and suc-
cessors in office (hereafter called "The Board of Corrections")
are ENJOINED from continuing to hold any prisoner in the Jails of
Jefferson County unless any such Jail meets the following conditions
and standards:

1. The population of the Jail at the Birmingham Courthouse
shall be reduced forthwith and shall be maintained at levels not
to exceed 1 in each "D-man" cell after 90 days after this decree
and not to exceed 2 in each such cell 12 months or more after this
decree. The population of the Jail at the Bessemer Courthouse shall
be reduced within 90 days to 6 persons in each "S-man" cell and 36
within each dorm; within 12 months the population shall be reduced
so that each inmate shall have at least 65 square feet of living
space with regular and frequent access to areas outside the dormi-
tory or cell block during each day; each inmate not having such
access to other areas shall be provided with 75 square feet of living
space. Until the levels of population are reduced to those
described above as the ultimate goal, inmates held in cell blocks,
other than those who escape or are security risks, shall immediately be
provided with the periodic opportunity to move between the cell
and the dayroom.

2. If, because the County Defendants are housing state
prisoners, the number of inmates exceeds the standards set forth
in Paragraph 1, the County Defendants shall notify the Board of
Corrections which shall take the excess into the penal system or
transfer them under the provisions of Ala. Code, § 14-6-87 et seq.
(1975).

Hale 00367

3.  Defendant Bailey shall provide opportunities for regular
outdoor recreation for all inmates as soon as possible, where
feasible.  Those inmates who, in defendants' judgment, may be
safely handled under correct supervision and facility constraints,
shall be provided with outdoor recreation opportunities forthwith.

4.  Within 60 days, Defendant Bailey shall provide safe
and appropriate means for inmates to store personal items in
their possession.

5.  Within 30 days, cells, dorms, and day rooms shall be
provided with sufficient direct or indirect illumination so that
inmates may read without eye fatigue and strain.

6.  Within 120 days, a ventilation system capable of pro-
viding 10 cubic feet of fresh air per inmate per minute shall be
installed and maintained.

7.  All cells, dorms, and day rooms shall be provided with
tempered and cold running water and a toilet flushable from the
inside.  The use of "oriental" floor toilets in isolation cells
shall be discontinued immediately.  The defendant Bailey shall
thoroughly clean and disinfect all showers and shall maintain them
in such condition.  Vacuum breakers shall be installed on all toilets
within sixty (60) days.

8.  Within 15 days, Defendant Bailey shall adopt and per-
manently post where visible in each day room and dorm a plan of
evacuation in case of fire.

*old Building*

9.  Within six (6) months, the State Defendants and Defendant
Bailey shall make reasonable efforts to identify those inmates
presently incarcerated in the Jefferson County Jails, who, by
reason of psychological disturbances or mental retardation, require
care in facilities designed for such persons, and to transfer such
inmates to such facilities in accordance with applicable state
law.

10.  Guards shall be stationed at all times so as to have
visual and voice contact with inmates held in isolation cells.
All other inmates shall be so situated that they may be seen and
heard on a regular basis by guards and have some method of communi-
cating with guards in emergencies.

11.  Defendant Bailey shall keep a medical record for each
inmate showing (a) the date the inmate went on sick call, (b) the
symptoms complained of and observed, (c) the persons examining the
inmate, (d) the diagnosis, (e) the medication prescribed, and
(f) follow-up recommended.  Defendant Bailey shall require each
outside provider of health care to furnish a similar record of the
care provided and shall place such record with the medical records
of the inmate.  Access to prescription drugs shall be limited to
licensed physicians and to nurses and medical technicians acting
under the supervision of a licensed physician; and nothing in this
order shall be construed to allow prescription drugs to be dispensed
except in accordance with applicable regulations of the Drug Enforce-
ment Administration.

It is further ORDERED as follows:

A.  Defendants shall report to the Court (with copies to all
counsel) ninety (90) days after this decree on their respective
efforts to achieve compliance.

B.  If the number of inmates exceeds the capacity limits or-
dered, the County Defendants shall forthwith inform the Court
(with copies to all counsel) of this fact, the date and excess
occurred, and the steps being taken to reduce population.

-2-

Hale 00368

C. For the efficient implementation of this judgment, monitors will hereafter be appointed by the court. The monitors shall receive copies of this Judgment and any subsequent orders in this case. The monitors shall send copies of their reports to all counsel.

D. Counsel for plaintiffs and amicus shall, upon reasonable notice, be allowed access to the Jefferson County Jails and shall be allowed reasonable access to relevant jail records.

E. The Court hereby expressly retains jurisdiction over this cause for the purpose of issuing such further orders as may be appropriate to secure compliance with Judgment and to protect the constitutional rights of the plaintiff class.

Done this the 2P<sup> day of August, 1978.

_Sam C. Pointer_
United States District Judge

Hale 00369

# Exhibit D



**Everything Alabama**

## 'Stacked' Jefferson County jail cries out for more space

Published: Sunday, August 29, 2010, 6:00 AM



By   **Carol Robinson --- The Birmingham News**

| ✕ Gallery |

The Jefferson County Jail was never before as crowded as it is this year.

As of last week, 1,255 inmates were held there on 4,491 charges. And one day last month -- July 26 -- 1,356 inmates were crammed into a space with a capacity for 1,035.

Conditions are so tight that 299 of them last week had to sleep on the floor.

Jefferson County has been sued in years past over jail conditions, but is not under a court-ordered capacity limit. But the U.S. Department of Justice says there's enough space in the jail for only 1,035 inmates, and officials fear that ongoing crowding could prompt the Justice Department to take action against the county.

The Sheriff's Office, which runs the jail, and inmates say the crowding sets the stage for trouble.

"I know we're society's undesirables, but we're still human," said Luke Dunkling, 28, who has been jailed since April on armed robbery charges. "Stacked in here like this, tempers are going to flare. You put enough lions in the cage and one of them is going to get killed."

Murder defendant Joshua Holten is 6-foot-4 and 300 pounds. He shares an 11-foot-by-7-foot cell with three other inmates, two of whom have previous attempted murder charges and a history of escape attempts.

Two sleep on beds and two on the floor on worn, threadbare pallets. One spends nights with his head under the toilet.

"You try to make the best of it, but it's not easy," said Holten, who is accused of murdering his former girlfriend at her Russet Bend Drive home. "When somebody's sitting on the toilet and somebody's head is right next to them, it's no fun."

There are more complaints, jail officials say, more fights and a volatile atmosphere.

But then, the bad feelings about jail extend beyond the bars.

The fight over funding at Jefferson County -- with words between Sheriff Mike Hale and the County

Hale 00012

Commission -- has often been vitriolic as Hale sought money to open the 414-bed Jefferson County Jail in Bessemer, which would relieve the crowding. It has been closed since September 2009, a move the sheriff made when $10 million was cut from his department's $61 million budget.

Last week, however, Commission President Bettye Fine Collins met with Hale to try to find a way to open the new jail.

"I agree with him that it is vital that we open that jail," Collins said.

**Bessemer space**

At the time the Jefferson County Jail in Bessemer closed, it could hold 244 inmates.

An $11.5 million expansion of the jail, which would boost the capacity to 414, is finished and has been empty since 2008 because the sheriff said he didn't have the money to hire deputies to staff the new floor, designed for 170 inmates.

Hale last week asked for additional money in his fiscal 2011 budget to open the Bessemer jail and staff the entire facility. The sheriff said the county jail in Birmingham is crowded and that creates a liability issue.

The 1,356 inmates housed at 809 Richard Arrington Jr. Blvd. on July 26 constituted the highest jail population in recent memory, sheriff's department officials said.

Of the jail population on Friday, 212 are state inmates, 145 of them ready to be transferred to Alabama prisons. Seventeen are serving their sentences at the lockup, and 988 are awaiting trial.

"The majority of these inmates have not been convicted of the crime they are charged with," said Capt. Ron Eddings, who commands the jail operations. "They aren't coddled, but they are to be treated like humans. It's not humane for people to sleep on the floor."

On the ninth floor of the jail, one of two floors that house the most violent offenders, 71 inmates are sleeping on the floor.

On the fifth floor, where female inmates are kept, 30 prisoners camp on the concrete.

Theresa Ward, 38, has been sleeping on the floor in Block 5G, where there are 32 women and 24 beds.

It's at least her second stint in the county jail on bad check charges.

"It's worse now," she said of her recent incarceration. "My back hurts, my head aches, I be cold. And everybody don't just get along."

Sheryl McCloud, who is being held on failure to appear on a second-degree theft charge, said she slept on

Hale 00013

the floor for a month. She, too, complains of the strain it put on her back and neck.

"When I first came, it was five people to a cell," McCloud said of the lockup designed for two.

**Falling short**

American Correction Association standards require 60 square feet of floor space for a double-bunked cell. With four and sometimes even five inmates to a cell, the county jail is falling far short of those requirements.

Without relief, said Jefferson County Chief Deputy Randy Christian, the U.S. Department of Justice could order a solution that potentially could cost much more than restoring the Bessemer Cutoff Jail to a fully functional facility.

The DOJ studied conditions at the Jefferson County Jail in the 1990s when there was a complaint. The study recommended 188 deputies to be assigned to the jail to lower the deputy-to-inmate ratio and bring the jail closer to the national standard of one deputy for every five inmates.

The jail has positions for 153 deputies. 125 of those are filled and the office has borrowed 16 deputies from other divisions to help out, upping the current staffing to 141.

"They are doing remarkable work under adverse conditions," Christian said.

Jefferson County is in line to receive about $45 million in unexpected revenue, some of which could help alleviate the problem if commissioners decide to spend the money that way.

Both Collins and Commissioner Sheila Smoot said some of the money should go toward alleviating the jail crowding.

Hale said the commissioners approached the sheriff's officials about the potential funding for the Bessemer jail.

"They asked us what it would take to open it to its former operation and what it would take it to open it to full operation including the expansion," he said. "The fact that they are considering it is encouraging to us."

If the County Commission approved reopening the jail, officials said they would begin immediately in phases.

"Obviously it will take a period of time to hire back lost personnel, but we would do that as quickly as humanly possible," Christian said.

Sheriff's officials are optimistic a solution can be found. They don't want to think about the alternative.

Hale 00014

"It has to be dealt with. We can't just pretend there isn't a big elephant in the room. It isn't going to go away unless we stop arresting the bad guys, and I don't ever see that happening," Hale said. "Believe me, Jefferson County is a safer place with these inmates behind bars. We plan to keep it that way."

*Join the conversation by clicking to comment or e-mail Robinson at* **crobinson@bhamnews.com**

**Jefferson County Jail overcrowding**

© 2012 al.com. All rights reserved.

Hale 00015

# Exhibit E



All Alabama    Click    Intermittent Clouds    Nov 73°    HOBBY LOBBY    Methodist Homes

NEWS    BUSINESS    SPORTS    U.S. SPORTS    ENTERTAINMENT    LOCAL BUSINESSES

JOBS    AUTOS    REAL ESTATE    RENTALS    CLASSIFIEDS    OBITUARIES    FIND N' SAVE

**Alabama**    78°    Search    Sign In | Register for free

Set your local edition ▸    5-day | Satellite

 **Top Stories**     FBI releases preliminary crime stats for 2011    Energy saving checklist for summer     Cast your vote in Legally Blonde's 'Search for Rufus'...

Home > Breaking News from The Birmingham News > Breaking News

# Jefferson County jail faces staff cuts amid overcrowding (slideshow)

Published: Monday, August 29, 2011, 5:30 AM    Updated: Monday, August 29, 2011, 8:00 AM

By Carol Robinson — The Birmingham News
Follow

Recommend    96 people recommend this. Be the first of your friends.    98    Share

Tweet    7    Email    Print



Enlarge    Tamika Moore — The Birmingham News

Conditions at the Jefferson County Jail, already crowded and understaffed, could get worse for inmates and their guards as budget cuts demand another 20 percent be shaved from all county departments. (The Birmingham News/Tamika Moore)

**Conditions at the Jefferson County Jail could get worse with budget cuts gallery (5 photos)**

BIRMINGHAM, Alabama -- Inmates at the Jefferson County jail sleep three or four to a cell.

They are allowed one clean uniform a week, which doesn't stay clean long. They are given fresh bed linens less often than that. They rinse out their underwear in the cell block toilets.

Overcrowding, underfunding and understaffing, jail officials say, is as bad as it has ever been.

One day last week there were 19 deputies guarding 1,200 inmates. Of those inmates, 216 were sleeping on the floor.

"The conditions right now I thought I'd never see," said Jefferson County Sheriff's Lt. Debbie Guy, who has worked in the county jail for 28 years.

"I know it's jail, but it's extra bad," said 28-year-old Demond Moore, who spent 64 days in the jail for giving false information to police.

As of Wednesday, Moore had been eligible for release for two days, but remained behind bars because of the lack of manpower to process his release papers. "The conditions," he said, "are horrible."

And it could get worse.

Budget cuts demand another 20 percent be shaved from all Jefferson County departments. Sheriff's officials, who will meet with Jefferson County commissioners on Tuesday, say it simply

Sponsored By:  www.alntelo.org

Impacted the state economy by $702 million

Alabama Technology Network

**More Breaking News from The Birmingham News**

Most Comments    Most Recent

Breaking News from The Birmingham News stories with the most comments in the last 7 days.

83    Immigration taps deep source of anger in commenters -- whatever is reported

79    Southern Poverty Law Center re-launches anti-immigration law hotline

62    Computer crash cripples Jefferson County

61    Alabama Power's coal-fired plant blamed for premature deaths

56    Birmingham school board president to Alabama superintendent: Let us draft our own financial plan

Hale 00021

isn't possible.

"It is dangerous for our deputies, dangerous for the inmates and the liability for the county is extremely high," said Chief Deputy Randy Christian. "The situation is dire and worse than I have seen it in 30 years. We have had better conditions than this when the Justice Department stepped in and forced something to be done in the past."

Jail is never a pleasant place, and it is not designed to be.

But with only one deputy overseeing entire floors at the county jail, with the safety of inmates -- and officers -- in the balance, sheriff's officials believe the department will soon be flooded with complaints and lawsuits.

"We want to make it crystal clear to the commissioners what we are facing, the liability this brings on the county and the potential lawsuits that will surely come if they aren't already being filed," Christian said.

Bessemer attorney Ralph Armstrong in a letter to Sheriff Mike Hale this month called jail conditions a "disastrous situation."

He said he and other area attorneys are being contacted by inmates and their families bemoaning jail conditions and restrictions: visitation and religious services were suspended in June, as was access to the exercise area and the law library.

"We haven't seen our families since June or July," said Dwayne Walker, 41, who has been jailed for 13 months awaiting trial on charges of assault, domestic violence and burglary. "We got a lot of questions, but no answers."

They want change, and they want it fast.

"I assume that I am correct and that you do desire to elevate these conditions and would do so if you have available resources," Armstrong wrote to the sheriff. "If this is not correct, please notify me immediately and I will proceed with filing a federal lawsuit. In the meantime, I am trying to keep another local attorney from doing so, but it appears that you are about to get hit with several of these proceedings especially due to the issue of overcrowding."

Jefferson County has been sued in years past over jail conditions, but is not under a court-ordered capacity limit. But the U.S. Department of Justice says there's enough space in the jail for only 1,035 inmates. The Jefferson County Jail in Bessemer was closed September 2009, a move Hale made when $10 million was cut from his then-$61 million budget. At the time it closed, it could hold 244 inmates. An $11.5 million expansion of the jail boosted the capacity to 414.

Christian said the jail averages 1,200 inmates and was only built to hold a maximum of 900. For classification purposes, he said, about 700 inmates is optimal.

Capt. Ron Eddings, who oversees the jail, has outlined for commissioners some of the major problems in the jail. At the top of the list, of course, is the overcrowding.

On Friday, there were 1,223 inmates in the jail. The highest one-day population in 2011 was on Jan. 27 with 1,287.

"Currently there are three to five inmates in each cell, with inmates on the floor," Eddings said. "No exercise period is provided because of increased security risk. Thirty to 36 inmates share one toilet and one shower in the day room."

Manpower is also a major concern. In 1998, federal authorities appointed a nationally-recognized corrections expert to assess the jail. He recommended 153 sworn officers to staff the jail with a population less than 1,100. For more than 1,100, he increased the manpower recommendation to 188.

Staffing is low, and it worsens by the day, Eddings said, because of retirement and transfers. So far in 2011, 42 sworn deputies have left the sheriff's office. Of those, 23 were jail deputies. The personnel shortage has been exacerbated by the 32-hour work week, which is the equivalent of a 22 percent reduction in force.



Convenient, affordable & delicious meal plans
LEARN MORE
CALL US: 205.822.3266

**Most Active Users**          What's this?

Users with the most al.com comments in the last 7 days

237          Pommostaciones

154          RushBama

112          tidepriden09

105          tcarl

86          Creole C.

**Users We Love**

willard999
This user doesn't mind saying "I told you so."

More Users We Love

**Connect with al.com**
What's this?

All Facebook & Twitter accounts »

**Recommendations**

     Women who accused Duke lacrosse players of rape charged with murder
105 people recommend this.

     Auburn coach Gene Chizik suffers the most personal insult of the week
40 people recommend this.

     Former Auburn players Ed Christian, Ladarious Phillips dead, Jimerson Eric Mack hospitalized after sh
1,821 people recommend this.

     Nick Saban says he will end his coaching career at Alabama
1,415 people recommend this.

Facebook social plugin

Hale 00022

There have been five inmate attacks on jail deputies in the past four months, Christian said. Before staffing levels were reduced, the frequency was about one attack per year.

**Deputies attacked**

"Attacks on deputies are increasing. Fights among inmates are much more frequent, and we don't have the resources to properly and safely intervene," Christian said. "We are having to keep them on lockdown sometimes as much as 22 hours of a 24 hour day. It is a powder keg right now."

"The inmates are becoming increasingly aware of our limitations and are seizing opportunities to attack our deputies and the prisoners they are sworn to protect," Eddings wrote in an outline to commissioners.

Christian said they desperately need to reopen the Bessemer jail.

One recommendation has been made to take deputies off the streets and use them to open the Bessemer Jail. That is unacceptable and unlawful, Christian said.

"We understand the dire financial situation the county is in, and shame on our elected leaders in the state legislature if they do not fix the situation," he said. "If they fail to do that we will never ever recover economically in this county. Never. You can only hold your finger in the leak so long before the floodgates open and wash everything away."

Related topics: Jefferson County

**Sponsored Links**

Mortgage Rates Hit 2.50%
If you owe under $729k you may qualify for 3.01% APR Govt Refi Plans.
www.Refinance LoweMyBills.com

Sports Psychology
Looking for information on Sports Psychology? Read top resources.
winnentalhealth.com

Central Air Conditioners
Budget Priced Central Air Systems Wholesale Prices To The Public
www.budgetheating.com

Need Real Estate Funding?
No Banks Required—Use Other's Credit & Funding—Get Starter Kit!
www.UnlimitedFundingProgram.com


The Nation's Fastest Internet
Charter Internet® Plus
$6.99 ONLY $29.99/mo    Charter

**From Our Advertisers**

• We'll Buy Your Car
• #1 Ranked Pool Builder in America!
• Arrive At Your Travel Information With Comfort, Style, and Ease!

Advertise With Us »

**Popular Tags**    What's this?

Alabama Legislature  alabama legislature 2012  Alabama Legislature 2012  April 27 2011 storms  april 27 2011 storms  bingo  bingo trial  Birmingham  Birmingham obituaries  Campaign 2010  Governor 2010  immigration law  January 23 2012 storms  Jefferson County  Jefferson County Commission  jefferson county occupational tax  Legislature 2011  legislature 2011  Live chat  Natalee Holloway  obituaries  occupational tax  Robert Bentley  Severe storms 2011  UAB

**Share this story**    Story tools    Email    Print

**More stories in Breaking News from The Birmingham News**

Previous story
Alabama Power crews heading to Baltimore to help restore power

Next story
Shelby, Hoover to share costs of Valleydale Road widening project

## 96   Comments   Feed

View: Oldest first | Newest first

1 | 2 | 3 | 4 | 5 | 6 | 7    Next comments »

Dean   August 29, 2011 at 10:20AM
Follow

Luckily the four Allbarn armed robbers are in a different county!

Reply    Post new    Inappropriate? Alert us.

smayes6   August 29, 2011 at 5:50AM